**MCS MANAGEMENT, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 00–639 C.**

United States Court of Federal Claims.

Filed Under Seal Dec. 21, 2000.

Reissued for Publication Jan. 18, 2001.

Sam Z. Gdanski, Suffern, NY, attorney of record for plaintiff. Jeffrey Gdanski and Scott Gdanski, of counsel.

Bryant S. Banes, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant, with whom were Deborah A. Bynum, Assistant Director; David M. Cohen, Director; and David W. Ogden, Assistant Attorney General. Julius Rothlein, U.S. Marine Corps; Andrea Mayer, U.S. Small Business Administration, of counsel.

## OPINION

DAMICH, Judge.

### I. Introduction

This is a pre-award bid protest. This matter is before the Court on cross-motions for judgment upon the administrative record.[1] Plaintiff seeks to enjoin the United

---

1. Plaintiff filed a motion for a permanent injunction pursuant to Rule 65 of the Rules of the Court of Federal Claims. However, Rule 65 does not refer to permanent injunctions. RCFC 65 concerns preliminary injunctions and temporary restraining orders. The Court will treat Plain-

States Marine Corps (USMC) from awarding two contracts for regional garrison food service. Plaintiff contends that the contracting officer's decision not to set aside the two solicitations exclusively for small business was arbitrary and capricious and in violation of procurement law. For the reasons stated herein, Plaintiff's motion for judgment upon the administrative record is DENIED. Defendant's motion for judgment upon the administrative record is GRANTED.

## II. Background

### A. Facts

The Requests For Proposal (RFP's) provide for award of two primarily fixed-price incentive contracts, with a base period of five years, and three one-year options, to provide regional garrison food service for the USMC at: (1) 32 messhalls on the East Coast (RFP M00027–00–R–0001), and (2) 23 messhalls on the West Coast (RFP M00027–00–0002). AR 4720 & 5252. The estimated value of each regional contract is approximately 45 million dollars. AR 3790. Current messhall contracts are valued between $360,000—$7,000,000 each. According to Defendant, the RFP's "represent a fundamentally new and qualitatively different approach of feeding Marines in the garrison messhall environment." AR iii-v. As stated in the RFP's, the goal of the regional approach is to maximize "food service efficiencies and technology in an effort to continue to provide quality food services for United States Marine Corps personnel and other authorized patrons while at the same time realize savings over current Marine Corps food service operating processes." AR 62 & 1581.

The current food service contracts are provided on a base-by-base, messhall-by-messhall basis, using the traditional "cook-serve" process by small businesses. According to Defendant, the regional approach to food service is driven by numerous considerations, including: (1) a savings of approximately $20 million per year; (2) budgetary shortfalls in operation and maintenance accounts; (3) the need to improve the consistency and quality of the food served; (4) advanced food technologies; and (5) the need to release Marines in the food service military occupational specialty to other Fleet operations. AR 3790–3806.

The Statement of Work (SOW) provides in pertinent part that "the Contractor shall provide all management, personnel, supervision, subsistence and other items and services as stated to perform Full Food Service (FFS), Management and Mess Attendant (M & MA), and Brig Messhall Management and Food Preparation (M & FP) tasks at various [east coast/west coast] Marine Corps installations as defined in this Contract ..." AR 56 & 1576. The following excerpt illustrates some of the changes from the current service:

Under the solicitations, the number of full food service messhalls will increase to 35. USMC has current contracts for mess attendant services at 28 of the messhalls, including 18 serviced by MCS and 10 serviced by four other small business concerns. Under the solicitations, mess attendant messhalls will be reduced in number to 17 and will become management and mess attendant messhalls, with the contractors now also responsible for management of the messhalls (as well as furnishing mess attendant services). (Food preparation will continue to be performed by the USMC cooks at the management and mess attendant messhalls). The contractors also will become responsible under the solicitations for management and food preparation for three brig messhalls not previously contracted out. In addition, under the solicitations, the procurement of subsistence (food) and (after a transition period) maintenance and repair of government food preparation and serving equipment, previously the responsibility of the Government, will become the contractor's responsibility at all messhalls. Further, the number of messhalls set-aside under JWOD, 41 U.S.C. § 46–48c, is increased from 9 to 20; JWOD organizations for the blind or other severely handicapped will operate the

tiff's motion as a motion for judgment upon the administrative record in which Plaintiff seeks a permanent injunction.

messhalls as subcontractors to the contractors.

AR iii-iv. Currently, the USMC contracts for full food service at eight messhalls. Plaintiff provides full food service at three of those messhalls and the other five are operated by National Industries for the Severely Handicapped ("NISH") workshops. AR 4720 & 5252. Plaintiff provides messhall management, food preparation and mess attendant services at its three full food service messhalls. *Id.*

The solicitations encourage but do not require the submission of proposals utilizing advanced food technologies like "cook chill"[2] centralized production facilities. However, the USMC believes that a successful offeror would more than likely have to base its proposal on such a centralized approach, together with cook chill technology, with 50–70 percent of the food processed in this manner. *See* AR 3790–91 & 3805–06. According to the USMC, centralized food production is fundamental to achieving the anticipated cost savings from the new procurement approach. The RFP's do not require the contractor to construct a centralized production facility. For instance, a contractor may procure "cook chill" products from an existing "cook chill" facility or contract for use of an existing "cook chill" facility from a third party. Whatever option the contractor chooses, the contractor is required to describe in detail its advanced food technology plans in its offer.

### B. Procedural History

Plaintiff filed two pre-award protests before the GAO.[3] In those protests, Plaintiff alleged, among other issues, that Defendant's decision not to set aside the two procurements exclusively for small business concerns was improper. AR 3744–89. After discovery and a hearing, on October 11, 2000, the GAO dismissed Plaintiff's protest, finding that the "USMC reasonably concluded that there was no reasonable expectation of receiving fair market price offers from at least two responsible small business concerns so as to warrant setting aside the requirements for small business concerns." AR ix-x.

Plaintiff filed the present action on October 30, 2000, challenging Defendant's decision not to set aside these two procurements exclusively for small business concerns and seeking a temporary restraining order. On October 31, 2000, the Court held oral arguments and denied Plaintiff's motion for a temporary restraining order. The Court set a briefing schedule for cross-motions for judgment upon the administrative record. The parties filed briefs in support of their positions on November 14, 2000. Reply briefs were submitted on November 21, 2000. Plaintiff filed a motion seeking to supplement the administrative record through discovery. The Court held a status conference on November 22, 2000, at which time it denied Plaintiff's motion to conduct expedited discovery; denied Plaintiff's motion for leave to file a congressional report; and ordered that Exhibits 3–9 and 13 of Plaintiff's motion for a temporary restraining order and the Moore affidavit attached to Plaintiff's motion for permanent injunction be stricken from the record. Lastly, on December 4, 2000, the Court held oral argument on the parties' cross-motions for judgment upon the administrative record.

### III. Standards of Review

#### A. Cross-motions for Judgment upon the Administrative Record

Pursuant to Rule 56.1 of the Rules of the Court of Federal Claims (RCFC), the parties move for cross-motions for judgment upon

---

**2.** In its rationale for consolidating the contracts, the USMC offers the following explanation of "cook chill":

> Cook chill is a U.S. Department of Agriculture approved food production process. Cook chill utilizes industrial-sized production equipment to prepare food in large batches. When the food is at a just-done state, it is bulk-packaged hot and rapidly chilled to below 40 degrees Fahrenheit. This rapid cooling essentially pasteurizes the food and provides extended shelf lives. The refrigerated foods are then distributed to individual messhalls for reheating and service on the scheduled menu day. *At no point in the cook chill process is the food "frozen."*

AR 4540.

**3.** The first protest was filed on July 10, 2000, for RFP 0001 and the second was filed on July 19, 2000, for RFP 0002.

the administrative record. This Court treats such motions the same as a motion for summary judgment under RCFC 56. *See Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996), aff'd, 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed. Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. 242, 106 S.Ct. at 2510. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed.Cir.1998) and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995).

The fact that both parties have moved for summary judgment is not an admission that no material facts remain in issue. *Massey v. Del Laboratories, Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997); *see also Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed. Cir.1988). Summary judgment will not necessarily be granted to one party or another simply because both parties have moved for summary judgment. *Corman v. United States*, 26 Cl.Ct. 1011, 1014 (1992). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States*, 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed.Cir. 1998). Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Cincom Systems, Inc. v. United States*, 37 Fed. Cl. 663, 671 (1997).

### B. Pre–Award Bid Protest

Jurisdiction is pursuant to 28 U.S.C. § 1491(b)(1) which provides that:

> [T]he United States Court of Federal Claims ... shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement ...[T]he United States Court of Federal Claims ... shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

The standard of review applicable to this case is the same applied by the United States District Courts to agency decisions pursuant to Section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, *et seq.* (1994). *See* 28 U.S.C. § 1491(b)(4). Section 706(2)(A) of the APA provides, in pertinent part, that a reviewing court shall set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In determining whether the government has acted arbitrarily or capriciously, Plaintiff bears the burden of showing that: (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; or (4) pertinent statutes or regulations were violated. *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974); *see also Metric Sys. Corp. v. United States*, 42 Fed.Cl. 306, 310 (1998). There is, however, "no requirement or implication ... that each of the factors must be present in order to establish arbitrary and capricious action by the Government." *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988). Judicial review of an agency procurement decision is extremely limited. *Analytical & Research Technology, Inc. v. United States*, 39 Fed.Cl.

34, 42 (1997). A reviewing court is not to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416–20, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In other words, if the Court finds a reasonable basis for the agency's action, the Court should stay its hand, even though with the same evidence before it the Court may have reached a different conclusion. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971). In a procurement case, a court may set aside an agency's action only when there is no rational basis for the agency's decision. *Id.* A reasonable basis for the agency decision "requires a rational connection between the facts of the situation and the decision made." *Crux Computer Corp. v. United States*, 24 Cl.Ct. 223, 226 (1991).

### C. Permanent Injunction

■ In order to be entitled to a permanent injunction Plaintiff must establish: (1) success on the merits; (2) that it will suffer irreparable injury if injunctive relief is denied; (3) that, if the injunction is denied, the harm to plaintiff outweighs the harm to the government and third parties; and (4) that granting the injunction is not adverse to the public interest. *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed.Cl. 303, 321–22 (2000); citing *Hawpe Constr., Inc. v. United States*, 46 Fed.Cl. 571, 582 (2000). "Because injunctive relief is so drastic in nature, plaintiff must demonstrate its right to injunctive relief by clear and convincing evidence." *Bean Dredging Corp. v. United States*, 22 Cl.Ct. 519, 522 (1991).

### IV. Discussion

#### A. Merits

##### 1. Small Business Set–Asides

■ The Federal Acquisition Regulations Section 19.502–2(b) provides in pertinent part:

The contracting officer shall set aside any acquisition over $100,000 for small business participation when there is a reasonable expectation that: (1) offers will be obtained from at least two responsible small business concerns offering the prod-

ucts of different small business concerns ...; and (2) award will be made at fair market prices. Total small business set-asides shall not be made unless such a reasonable expectation exists ... Although past acquisition history of an item or similar items is always important, it is not the only factor to be considered in determining whether a reasonable expectation exists.

FAR § 19.502–2(b). A contracting officer's decision not to set a solicitation aside for small business concerns is a matter of business judgment within the contracting officer's discretion. *See McSwain & Assoc., Inc.; Shel–Ken Properties, Inc.; and Elain Dunn Realty*, Comp. Gen. B–271071, May 20, 1996. Although the law does not require the use of any particular method for assessing the availability of small business, the contracting officer must undertake reasonable efforts to determine whether it is likely that offers will be received from at least two responsible small businesses at fair market prices for each regional contract. *See Mortara Instrument, Inc.*, Comp. Gen. B–272461, Oct. 18, 1996. The contracting officer may consider and base its decision on such factors as prior procurement history, the nature of the contract, market surveys, and/or advice of the agency's small business specialist. *Id.*

■ In this case, Plaintiff argues that Defendant's decision not to set aside the two solicitations exclusively for small business concerns was arbitrary, capricious and in violation of procurement law. Plaintiff presents essentially three arguments to support its position. First, Plaintiff maintains that the contracting officer never performed an analysis of whether a reasonable expectation existed that it would receive at least two offers from responsible business concerns at a fair market price because it assumed that the contract was too large for small business to perform. Plaintiff contends that the contracting officer's actions were unreasonable because he failed to investigate the capabilities of the small businesses that expressed interest in the solicitations. Second, Plaintiff contends that the two regional contracts do not represent a new requirement, and can be handled by small business concerns currently performing food service contracts for the

USMC. Lastly, Plaintiff argues that the contracting officer incorrectly determined that the Randolph–Sheppard Act, 20 U.S.C. §§ 107–107f, prohibited the USMC from setting the procurements aside exclusively for small business concerns.

In contrast, Defendant maintains that based upon the market analysis conducted by the USMC, the contracting officer's decision that offers could not be obtained from at least two responsible small business concerns at fair market prices was reasonable. Defendant contends that the two solicitations are a new and qualitatively different approach to food service because prior contracts were much smaller in scope and not as complex as the current requirement. Lastly, Defendant argues that the contracting officer properly determined that the Randolph–Sheppard Act applied to the solicitations, thereby prohibiting the USMC from setting the contracts aside exclusively for small business.

2. The USMC Efforts to Ascertain Small Business Interest and Capability.

In 1998, the USMC began making plans for a regional approach to food service contracting. AR 3790. After several months of briefings, the Headquarters, USMC Executive Steering Committee endorsed the regional approach to food service. *Id.* The Commandant of the Marine Corps approved the recommendation on September 10, 1998. *Id.* The USMC contends that it undertook the following efforts to determine whether the two solicitations should be set aside for small business concerns:

(1) On February 3, 1999, the contracting officer met with the Small Business Administration (SBA) to discuss the regional food service contracts. AR 4436–44. Because of these discussions, the USMC agreed to conduct two industry forums, one on each coast, to ascertain small business interest. AR 3792.

(2) On February 9, 1999, the contracting officer sent letters to all eight incumbent small business contractors providing advanced information concerning the regional food service initiative and asking for input from small business.[4] *See* AR 4684–99.

(3) On March 3, 1999, the contracting officer issued a pre-solicitation notice to 33 companies that had expressed interest in the synopsis of the contracts in the Commerce Business Daily. AR 4445–51. Specifically, the contracting officer asked the food service industry how it proposed to service the Marine Corps bases on a regional basis.[5] AR 4446.

---

4. The letters read in pertinent part:

> As an incumbent Marine Corps food service contractor, you will likely be affected by and have an interest in this initiative. For this reason, we are writing you directly regarding the program ... We would ... encourage your participation and thoughts on: (1) how small businesses can best remain involved, and/or (2) how innovative techniques and technologies can best be applied to our requirement ... After you have had a chance to review our consolidated requirement and new approach to meeting that requirement, we would welcome whatever thoughts or concerns you might have, expressed directly in response to the RFI or at the follow-up industry forum.

5. In the cover letter the contracting officer wrote:

> Our goal is to gather as much information from the food service industry as possible with respect to general approaches in fulfilling our requirements, as well as specific issues of concern to interested parties. Your comments and thoughts will be invaluable to us as we finalize our Statement of Work and Request for Proposal.

AR 4445.

The pre-solicitation notice provided in pertinent part:

> The Government wants to learn how industry would propose to service Marine Corps bases on a regional basis. In this regard the Government will entertain any and all suggestions regarding advanced food service preparation methodologies and technologies to maximize food service support efficiencies and savings. Therefore, you are encouraged to submit any concepts, ideas and suggestions that you would like us to consider in developing the final Statement of Work and Request for Proposal (RFP).

AR 4446.

The notice also stated, "... each mess hall presently under contract is receiving service from either a small business or a non-profit agency ... We ask for your views, ... on how the impact on JWOD and small business communities may be minimized; e.g., through teaming arrangements or subcontract relationships." AR 4447.

(4) On May 11 and May 13, 1999, the USMC held industry forums at Camp Lejeune, North Carolina and Camp Pendleton, California, respectively, in an effort to determine small business interest and capabilities. *See* AR 4468–82.

(5) On July 14, 1999, the USMC held a meeting with the SBA to discuss the results of the pre-solicitation notice, the industry forums, a Freedom of Information Act request concerning the procurements, and the impact of the Randolph–Sheppard Act. AR 3793.

(6) On July 31, 1999, the contracting officer issued a draft statement of work (SOW) and proposed evaluation factors for award for industry comment. *Id.*

(7) On September 15, 1999, after consultation with the USMC small business specialist, the contracting officer notified the SBA of its decision to consolidate the requirement and issue the procurement as unrestricted. AR 4529–30.

(8) On October 12, 1999, the SBA produced five letters from small business concerns, dated July 6, 8, 12, 13, 1999, which expressed an interest in the two contracts. AR 4483–99. The contracting officer reviewed the five letters and determined that the information contained in them did not demonstrate that at least two responsible small business concerns would submit offers. AR 3797–98.

(9) The contracting officer also consulted, as he did in the past, with the USMC small business specialist, Ms. D'Agostino, who agreed that it was inappropriate to set aside the two solicitations exclusively for small business. AR 4676.

(10) The decision not to set aside the solicitations exclusively for small business was also reviewed by several levels within the USMC. AR 3794. The SBA appealed the contracting officer's decision to the Head of the Contracting Activity (HCA) and the Assistant Secretary of the Navy for Research. Development, and Acquisition. AR 3795. Both of these appeals were denied. *Id.*

(11) In response to a request made by the GAO on September 8, 2000, the USMC conducted further investigation into the capabilities of small business concerns using SBA's PRO–Net system and Dun & Bradstreet reports. AR 4761. The USMC also requested additional information directly from small businesses concerning current DOD contracts for mess attendant and food service contracts.[6] AR 5390.

3. The contracting officer's decision was not arbitrary or capricious because it was a reasonable business decision supported by the record.

Plaintiff's argument that the USMC failed to perform an analysis of whether there were two responsible small business concerns that would submit offers at fair market prices is wholly without merit. This assertion is not supported by the record. On the contrary, the record indicates that the USMC went to great lengths to publicize the solicitations and to ascertain small business interest and capabilities. The contracting officer did not abuse his discretion in deciding not to set aside the two contracts exclusively for small business because his decision was based on a rational assessment of the scope and com-

---

**6.** On September 26, 2000, the USMC small business specialist provided the GAO additional information on small business capability. *See* AR 5390–95. Specifically, information was requested from Triple P Services, Inc., H & R Services, Inc., Rice Services, Ltd., and Selrico Services, Inc. *Id.* The small business specialist indicates that:

Information was requested directly from these companies as well as from the Small Business Administration, and from cognizant Govern-

ment contracting officers and agency small business specialists. Triple P Services and Selrico Services provided information by fax. Rice Services responded orally. H & R Services promised to send information by fax, but nothing has been received despite several follow-up phone calls. The contract information for H & R Services was obtained from a contracting officer. The Small Business Administration has provided no information.

AR 5390.

plexities of the solicitations, the prior procurement history, input obtained from industry and consultations with the SBA and the USMC's small business specialist. Plaintiff may disagree with the contracting officer's chosen methods; however, Plaintiff has failed to prove that the decision was unreasonable.

Despite the efforts outlined above, Plaintiff nonetheless argues that the USMC did not conduct an analysis to ascertain whether there were at least two responsible small business concerns that would submit offers at fair market prices. Plaintiff places great emphasis on language contained in letters sent by the contracting officer to small business concerns. Specifically, Plaintiff refers to the following language in the March 3, 1999 pre-solicitation notice:

> A critical element of this acquisition is the socioeconomic considerations that the Government advocates by various statutes and implementing regulations. As can be seen on the following charts each mess hall presently under contract is receiving services from either a small business or a non profit agency performing under the Authority under the Javits Wagner Oday Act (JWOD) Act. We ask for your views, in response to this Pre-solicitation Notice on how the impact on the JWOD and the small business communities may be minimized; *e.g., Through teaming arrangements and sub contracting relationships.*

AR 4447 (emphasis added). Plaintiff contends that this language illustrates that Defendant assumed small business could not perform as a prime contractor. Because of this assumption, Plaintiff contends that no analysis, "let alone a reasoned one," was performed of whether at least two small business concerns would submit offers at fair market prices. Considering the scope and complexity of the new requirements, the Court cannot fault the USMC for questioning whether small business concerns were capable of performing the new requirements. But this does not prove that the USMC failed to perform any analysis.

As set out above, it is evident from the administrative record that the contracting officer used a variety of methods to ascertain small business interest and capabilities. The law does not require any particular method. For instance, in the cover letter of the pre-solicitation notice, the contracting officer stated: "Our goal is to gather as much information from the food service industry as possible with respect to *general approaches in fulfilling our requirements, as well as specific issues of concern to interested parties.*" (emphasis added). *See also supra* note 4. This language evidences the USMC's attempt to ascertain small business interest. The failure on the part of small business to seize this opportunity reflects poorly on small business concerns not on the efforts of the contracting officer.

Plaintiff also relies on a statement made by the USMC small business specialist in response to questioning from the GAO:

> Ques: What efforts did the agency take to investigate the capabilities of the small business concerns that made known, before the solicitation was issued, their interest in competing?
>
> Ans: The Marine Corps did not do a detailed investigation of the capabilities of the five firms that submitted letters. There was no requirement to do so, and indeed, the letters spoke for themselves. Three of the letters were brief form letters containing nothing substantial beyond their expressions of interest. The other two letters reflected experience in terms of relatively small contracts at single installations. There was nothing in any of the letters that would have warranted further study or investigation.

AR 4679–80. Plaintiff argues that the above statement also supports its contention that the USMC did not conduct any analysis of whether there were two responsible small business concerns that would submit offers at fair market prices. Market surveys, however, are only one method of determining whether to set aside contracts exclusively for small business. The USMC small business specialist explained:

> This regionalization effort does not lend itself to the traditional market survey method, where a determination is made of the number of small business sources for a

particular product or service, and how many offers are likely to be received under a solicitation. This is because the Regional Garrison Food Service initiative represents a new concept with no procurement history. There has been no comparable food service endeavor, in size or complexity, within the Department of Defense. While there are numerous smaller food service contracts, no such contract to date is of the magnitude contemplated by the solicitations in question. Thus there is no valid historical model that we can use to affirm that small businesses can compete and do the job, and a market survey will not identify small firms that can reasonably be expected to submit viable offers. Because the traditional market survey approach was not appropriate in this procurement, we used some other approaches to identify small business interest and capability to perform this fundamentally new and qualitatively different approach to the provision of food service in the Marine Corps.

AR 4677–78. The Court finds the USMC small business specialist's assessment rational.

Plaintiff appears to argue that the contracting officer had an affirmative duty to ask small business concerns, that expressed interest in the contracts, how they would perform the requirements of the contract. Specifically, Plaintiff refers to the small business concerns that submitted letters in July of 1999, to the SBA. To support its assertion, Plaintiff relies on *Griffy's Landscape Maintenance, LLC v. United States*, 46 Fed. Cl. 257 (2000). That case is inapposite, however. *Griffy's* involved a post award challenge to a contract for tree trimming and right of way maintenance services at a military installation. *Id.* In that case, the agency failed to award Griffy points for a past-performance factor because of absent insurance point of contact information. *Id.* at 258. The court held that the agency's failure to inquire concerning the absence of insurance information in *Griffy's* bid was arbitrary and

capricious. *Id.* The court found that the agency had a duty to inquire because the absence of the information indicated a clerical error. *Id.* Moreover, 48 C.F.R. § 14.406–1 required "in cases of apparent mistakes or where the contracting officer believed that a mistake may have been made, the contracting officer shall request from the bidder a verification of the bids." *Id.* at 259.

The present situation is unlike that in *Griffy's*. This case does not involve a clerical error as in *Griffy's*. Furthermore, Plaintiff fails to cite a FAR provision that mandates an affirmative duty to inquire as was present in *Griffy's*. Here, the contracting officer must undertake reasonable efforts, but there is no statute that requires a particular method or imposes a duty to inquire.

Plaintiff also cites a number of GAO decisions as models [7] of what it believes the USMC should have done to ascertain whether the solicitations should have been set aside exclusively for small business. The Court is not bound by GAO decisions. The case law, although instructive, does not mandate that a contracting officer must contact a small business concern in every instance and ask how they would perform a potential contract, as Plaintiff argues should be done. Particular circumstances may trigger an obligation on the part of the contracting officer to further inquire, but a duty to inquire, as argued by Plaintiff, is not mandated by statute or regulation. The determination to use one particular method over another in assessing whether a reasonable expectation exists that at least two small business concerns will submit offers is within the contracting officer's discretion. Moreover, the determination is highly dependent on the particular circumstances of the case. Thus, the cases are distinguishable.

In *Safety Storage, Inc.*, Comp. Gen. B–280,851, October 29, 1998, the agency's decision was found to be unreasonable when, without supporting facts, its decision not to set aside the requirement for small business was based primarily on the complexity of the procurement and the fact that it was a first

---

7. Plaintiff relies heavily on two cases: *McSwain & Associates; Shel–Ken Properties, Inc.; and Elaine Dunn Realty*, B–271071, May 20, 1996, and *Safety Storage Inc.*, B–280,851, October 29, 1998.

time buy. *Id.* at 3. The GAO determined that the contracting officer had not undertaken reasonable efforts in ascertaining small business capacity to perform the contract. *Id.* Unlike the present situation, the GAO noted that there was no evidence in the record that the contract was beyond small business capability, or that the agency had surveyed the three small businesses that had expressed interest in the solicitations to assess their capabilities, or that there had been any attempt to coordinate its determination with its small business specialist or the SBA. *Id.* The Court notes that the GAO did not specify how the contracting officer was to survey the capabilities of small business, it merely stated that there was no evidence that it had done so.

In *McSwain & Associates, Inc.; Shel–Ken Properties, Inc.; and Elaine Dunn Realty,* Comp. Gen. B–271071, May 20, 1996, the contracting officer's decision was found unreasonable where it was based on incomplete information and unsupported assertions. That case involved real estate asset manager services. *Id.* at 1. The contracting officer concluded that the service areas were too large to be successfully serviced by small business but, unlike this case, had not performed a comparison of current requirements to those service areas successfully performed by small business. *Id.* at 2. The GAO concluded that the contracting officer "did not conduct an adequate review of the potential small business market. *For instance,* the agency did not contact any of the small businesses that expressed interest in the contract, or those with known REAM[8] contract experience to ascertain whether they were qualified to meet the increased requirements." *Id.* (emphasis added). In the present situation, the contracting officer sent letters to the small business concerns asking how they could service the USMC regional food service requirements. *McSwain,* however, does not mandate any particular method, it merely suggests certain methods. From a careful reading of *McSwain,* it is evident that the contracting officer could have contacted the small businesses, but it was not a requirement.

In *Wind Gap Knitwear, Inc.,* Comp. Gen. B–251,411 March 31, 1993, the contracting officer's decision was found to be unreasonable when it was based upon outdated and incomplete information. In this case, the contracting officer's decision is supported by a recent assessment of small business capabilities. *See* AR 4761–63 & 5390–95.

In another case, unlike the present situation, a contracting officer's decision was found unreasonable where the contracting officer relied upon outdated procurement history instead of investigating the numerous small business responses to its announcement in the Commerce Business Daily, or performing a current market survey or consulting the small business representative or SBA. *See ACCU–Lab Medical Testing,* Comp. Gen. B–270,259, February 20, 1996. A decision not to set a contract aside for small business also cannot be based solely on a procurement that is dissimilar in size and scope, especially when the current requirement is a reduction in size and scope from the previous requirement. *See American Imaging Services, Inc.,* Comp. Gen. B–246,-124, February 13, 1992. In this case, the contracts have increased in size and complexity.

In short, the above cases illustrate that in order for a contracting officer's decision to be reasonable, there must be a rational connection between the facts and the decision made. Gaps in logic and reason lead to arbitrary conclusions. Although reasonable efforts must be undertaken, no particular method is mandated.

The parties also are in disagreement as to whether the two solicitations are fundamentally new and qualitatively different. Plaintiff contends, although the contracts are larger, they are essentially the same because the Marines will be eating the same food. In contrast, Defendant argues that the two solicitations are not only larger but highly more complex. Because this factor played a large role in shaping the USMC efforts to ascertain small business interest and capabilities, Plaintiff challenges this contention. If the Court were to find the requirements to

8. REAM is an abbreviation for Real Estate Assent      Manager Services.

be essentially the same as the existing contracts, this would tend to favor small business because the USMC is currently contracting with small business. However, Plaintiff's position is without merit. After careful review of the requirements, the Court agrees with the USMC's assessment that the requirements are fundamentally new and qualitatively different. The following excerpt from a statement of the contracting officer highlights the differences in scope and complexity of the requirements:

5. My decision not to set aside the solicitation for small business was based on a number of factors. The first and most significant consideration was the scope of our regional efforts. Our existing contracts at each base call for messhall services, either full food services (encompassing both food preparation and mess attendant services) or mess attendant services only. The Marine Corps acquires the necessary food, provides the food to the contractor, and maintains the food service equipment on site. The contracts are structured on a firm-fixed price basis, with a base period of performance of one year or less, and three to five one-year options. In contrast, the regional contracts will involve multi-location responsibilities at all of our garrison messhalls within the continental United States. At most of the messhalls, the contractor will be required to provide full food service, at less than one-third of the messhalls the requirement will be for mess attendant services, and at three messhalls food preparation only will be required. The prime contractor will also be responsible for the acquisition, ownership, storage, and distribution of food, to both the central food production facility (if used) and to the messhalls. Maintenance of food service equipment will, starting in the second year of the contract, be a responsibility of the contractor. Thus the prime contractor will be ultimately responsible for not only the service element, as before, but also the supplies (raw and prepared food) in the messhalls, and equipment maintenance.

6. The contract itself will be far more complex than anything the Marine Corps has attempted in the food service arena. A multi-year contract, with a base five-year period and three one-year options, is planned. This contract type was chosen in consideration of the possibility that the prime contractor may choose to make a substantial investment in advanced food technology early in the contract term to achieve long-term savings. Our multi-year contract offers the guarantee of at least a five-year contract (with a cancellation charge in the event of earlier termination), over which such investment costs can be amortized, and thus affords the contractor a significant level of protection against financial risk. It is noted that both small businesses and the SBA requested that we consider the use of a multi-year contract to help level the playing field with large businesses from the standpoint of risk. In addition, we require that offerors price the effort on a Fixed–Price Incentive (FPI)—Firm Target basis. We ask that all costs, with the exception of equipment maintenance and extended service hours, be consolidated into a single, per-meal price. There is no breakdown by meal (breakfast, lunch, breakfast brunch, etc.), by messhall, or by type of services required. All labor, subsistence and overhead must be rolled into each yearly per-meal line item. The contract will set forth, for each contract year, a single Target Cost and Target Profit figure for each meal served, with the amount of final profit paid based on whether actual costs incurred are above (overrun) or under (underrun) target cost. While provisional payments will be made every two weeks based on the projected number of meals served, adjustments will be made quarterly for actual meals served and deductions made for performance below established standards.

7. The regional contractors will be required to assume responsibility from the incumbent contractors at every messhall within the region, with no break in service. The Phase–In Plan will be critical— while the contractor will not be required or expected to take over all messhalls in the region on a single day, the more quickly that can be accomplished the

more favorably the proposal will be viewed. Similarly, if the successful offeror includes advanced food technology into its plan, integrating that technology into its overall approach as quickly as possible poses another challenge. Interfacing with the various NISH CRPs, both in negotiations prior to contract award and in a prime/subcontractor relationship after award, is required due to the mandatory nature of the JWOD Program.

AR 3798–99. In short, the evidence in the record provides ample support that the requirements in the RFP's are fundamentally new and qualitatively different than the current contracts.

In this case, Plaintiff has failed to prove that the contracting officer's decision was unreasonable or in violation of procurement law. The record indicates that the contracting officer took reasonable efforts to ascertain small business interest and capabilities. According to the contracting officer, very little meaningful input was received from any small business concerns in response to letters sent or industry forums conducted. For instance the March 3, 1999, pre-solicitation notice sent to 33 companies elicited 13 responses, four of which were from small businesses. Those responses, the contracting officer determined, did not provide an indication that any small business could perform the requirements. Rather, the responses were criticisms and complaints concerning the regional initiative. *See* AR 4455–67. The contracting officer also concluded that the coastal forums yielded little useful information concerning small business capabilities based on his assessment of questions and discussions with attendees. Furthermore, the record indicates that no small business concerns contacted the contracting officer to express interest in the solicitations after the industry forums. The Court also notes that no small business concerns responded to the Statement of Work issued on July 31, 1999. Thus, it was rational for the contracting officer to interpret the lack of response to the USMC initiatives as a lack of interest in the requirements of the contracts.

The record indicates that the capabilities of small business continued to be evaluated after the contracting officer made his determination not to set aside the two solicitations for small business. Specifically, the contracting officer and the small business specialist analyzed the five letters brought to its attention on October 12, 1999, by the SBA.[9] The Court finds it peculiar that the SBA received expressions of interest from five small business concerns in July of 1999, but did not forward these letters to the contracting officer until October 12, 1999, after the determination to issue the two solicitations as unrestricted was made. This is especially odd because the contracting officer met with the SBA in July to discuss the solicitations. Nonetheless, the record indicates that despite the late arrival of these letters, the contracting officer reviewed the letters and determined that they did not demonstrate that at least two responsible small businesses could reasonably be expected to submit offers. AR 3797. The contracting officer was of the opinion that the letters evidenced a lack of effort and attention to detail on the part of the firms submitting the letters. *Id.* In particular, the contracting officer noted that four of the five letters submitted contained the following identical language:

> It is our intention to submit a proposal regarding any RFP the Marine Corps advertises in the food service area, including the possible regionalization of these services. The following is a brief company history that demonstrates our ability to provide a fair market offer and our capability of performing that contract requirements.

AR 4483, 4486, 4487 & 4499.

He concluded that the letters appeared to be modeled after a generic form letter. The letter sent by H & R Services also supports this theory. In that letter, the drafter failed to delete the statement: "(Note: Please provide company information/business history here.)" *See* AR 4499. Additionally, considering the scope and complexity of the new

---

**9.** The five letters were submitted by Selrico Services, H & R Services, Triple P Services, Rice    Services and Moore's Cafeteria.

requirements, the contracting officer assessed that the information provided by small business concerns did not warrant a small business set aside. The Court concludes that the contracting officer's assessment of the letters was reasonable. *See* AR 3794–98.

The contracting officer's decision is supported by a current market analysis. During the proceedings before the GAO, the parties were presented with the opportunity to provide additional information on the capabilities of small business.[10] The contracting officer and the USMC small business specialist using the Small Business Administration's PRO–Net system and Dun & Bradstreet reports further researched the capabilities of the business concerns. *See* AR 4761. The USMC small business specialist also requested additional information from small business concerns relating to current DOD mess attendant and food services contracts. *See* AR 5390. Even after consideration of the additional information, the contracting officer concluded that there was no basis for making a determination that there is a reasonable expectation of receiving offers from two small business concerns at fair market prices. The Court finds this assessment reasonable.

For instance, Dun and Bradstreet assigned H & R Services a credit rating of limited because of its "slowness in meeting trade obligations and open suit, liens or judgments" in Dun and Bradstreet's file. AR 4763. Moreover, in comparison to the regional food service requirement, the contract listed for H & R Services was for a small amount ($568,960 highest year) and was only for mess attendant services. AR 5391. Because of the shaky financial history, the contracting officer rationally concluded that H & R Services would be a poor candidate for the regional food service procurements.

The information obtained concerning Rice Services indicated two contracts, one for messhall services ($2.6 million) and the other for full service ($543,576). AR 5391. The

small business specialist ascertained that Rice's experience did not evidence an ability to manage a regional food service contract. *Id.* In particular, the Court found it interesting that Dun & Bradstreet reported that on August 24, 2000, a partner with the company declined all financial information and that the company would not disclose the number of employees. AR 4761.

With respect to Triple P Services, the PRO–Net report indicated gross receipts of $10.5 million and 500 employees. AR 4762. However, only one full food service contract was listed valued at $1 million a year with a period of performance of four years and ten months. *Id.* The Dun & Bradstreet report indicated that Triple P Services' primary business is janitorial services and only five percent of its work is in the area of food service. *Id.* According to information provided by the company, it has three contracts for mess attendant services valued for less than $1 million per year. AR 5390.

The record indicates that Selrico provided information on thirteen contracts, seven for mess attendant services, three for food service and three for full food service. AR 5391. Based on an evaluation of these contracts, the USMC small business specialist determined that there was no indication that the company could perform a regional contract. *Id.* It was also noted that the company was "determined to be outside of the competitive range due to deficiencies in its technical proposal" in a recent food service competition conducted at Camp Pendleton. AR 4762.

From the Court's own review of the information, there is nothing unreasonable or irrational about the contracting officer's or small business specialists' assessment of the small business capabilities. Even assuming that Plaintiff would be a responsible offeror, the contracting officer reasonably concluded that there is not another responsible small business concern.

## V. Conclusion

The Court concludes that the contracting officer's determination not to set aside the

---

10. Further inquiry was conducted with respect to the business concerns that submitted letters of interest in July of 1999. These include: Triple P Services, Inc.; H & R Service, Inc.; Rice Service, Ltd.; Selrico Services, Inc.; and MCS. However, no further information was requested from MCS.

solicitations exclusively for small business concerns was not arbitrary or capricious or in violation of procurement law because it was a reasonable business decision.[11] Because Plaintiff fails on the merits, Plaintiff is not entitled to a permanent injunction.

Plaintiff's motion for judgment upon the administrative record in which it sought an injunction is DENIED. Defendant's motion for judgment upon the administrative record is GRANTED. The Clerk of the Court is directed to enter judgment for Defendant and is ordered to dismiss the complaint.

---

**11.** Because the Court finds that the contracting officer's decision was reasonable and did not violate procurement law, the Court does not address the issue of the Randolph–Sheppard Act.