BLUE DOT ENERGY COMPANY, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Waste Management of Washington, Inc., Defendant–Intervenor.

No. 04–644C.

United States Court of Federal Claims.

Dec. 13, 2004.

David J. Taylor, Tighe Patton Armstrong Teasdale, P.L.L.C., Washington, D.C., for plaintiff.

Kelly B. Blank, United States Department of Justice, Washington, D.C., for defendant. Clarence D. Long, III, United States Air Force, of Counsel.

William A. Shook, Preston Gates Ellis & Rouvelas Meeds, L.L.P., Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION DIRECTING ENTRY OF FINAL JUDGMENT

BRADEN, Judge.

On October 4, 2004, the President of the American Enterprise Institute, delivering the second of the 2004–2004 Bradley Lectures, "Competition in Government," that captured the essence of this case:

> It may sound odd to suggest competition as a new principle, for few ideas are invoked more frequently in American policy debate. But the conventional usage is reflexive and superficial, and often opportunistic and insincere. We all favor competition except when it comes to ourselves— that is, to the things we really care about—where we do everything possible to avoid it.

Christopher DeMuth, "Competition in Government," *at* http://www.aei.org/news21341/.

In this case, defendant ("Government") did everything possible to avoid competition.

This post-award bid protest tests the vitality of the Competition in Contracting Act, 10 U.S.C. § 2302, *et seq.* *("CICA")*, that requires executive federal agencies procure property or services to "obtain full and open competition through the use of competitive procedures[.]" 10 U.S.C. § 2304(a)(1)(A). Although, the underlying dispute pits two business rivals against the other akin to David and Goliath, the import of the case concerns the jurisdiction of the United States Court of Federal Claims and exercise thereof to ensure that competition is not relegated to a mere platitude or simply a "goal" in government contracting, but rather is the governing principle that Congress intended when the CICA was enacted.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND[1]

A. **2002 Proceedings Before The Small Business Administration Concerning The Department Of Air Force's Solicitation F45613–02–Q–A027.**

On May 29, 2002, a contracting officer for the 92d Civil Engineer Squadron of the United States Air Force ("Air Force") issued Solicitation F45613 –02–Q–A027 to procure recycling and solid waste management services for Fairchild Air Force Base in the State of Washington ("Fairchild AFB"). *See* AR at 1–64, 187. Solicitation F45613–02–Q–A027 was set-aside for companies that are located within historically underutilized business zones ("HUBZone"). *See* AR at 1–18; *see also* 15 U.S.C. § 632(p)(3) (defining a HUBZone small business as: one owned and

controlled by one or more persons, each of which is a United States citizen; Alaska Native Corporations owned and controlled by Natives, including certain qualified direct or indirect subsidiaries; or owned wholly or in part by Indian tribal governments; or owned wholly by certain community development corporations). Blue Dot Energy Company, Inc. ("Blue Dot")[2] was the incumbent and prime contractor on Contract No. F45613–01–D–A001, however, the Air Force decided not to renew the first option year, because it was not satisfied with the company's performance. *See* AR at 212–21, 234–35. Nevertheless, Blue Dot and four other firms submitted bids on Solicitation F45613–02–QA027. *See* AR at 150–77, 234–36. The Air Force claims that Blue Dot submitted a technically marginal proposal on the later Solicitation. *See* AR at 411–12; *see also* AR at 212–21, 234–35.

On August 22, 2002, the Air Force informed Blue Dot that Olgoonik Logistics, L.L.C. ("Olgoonik")[3] was awarded Contract No. F45613–02–D–A001. *See* AR at 241, 303. Blue Dot filed a timely protest with the Small Business Administration ("SBA") challenging Olgoonik's status as a small business and qualified HUBZone business. *See* AR at 322–40. On September 26, 2002, the SBA ruled that although Olgoonik was a HUBZone business, it was not a "small business," because Olgoonik was "affiliated" with Waste Management—Washington.[4] *See* AR at 329–40. On November 22, 2002, the Air Force advised Blue Dot that the contract with Olgoonik would be terminated, but Blue

---

1. The relevant facts recited herein were derived primarily from the April 21, 2004 Administrative Record ("AR"), as well as supplemental materials provided by the parties at the request of the court. *See* TR at 52, 57. In the public version of this Memorandum Opinion and Final Judgment, the court has deleted specific price and other business information of a confidential nature, subject to an April 19, 2004 Protective Order.

2. Blue Dot is a minority operated corporation, organized under the laws of the State of Kansas with its principal place of business in Junction City, Kansas. *See* Plaintiff's Complaint for Declaratory and Injunctive Relief ("Pl.Compl.") at ¶ 1. Blue Dot is certified as a HUBZone small business. *Id.* at ¶ 9. For the contract year October 1, 2002 through September 30, 2003, Blue Dot provided $[ ] in services, pursuant to three other federal government contracts, *i.e.*, McCon-

nell AFB, Kansas: $[ ]; Veteran's Administration Heartland Network, Leavenworth, Kansas: $[ ]; and the Veteran's Administration Medical Center, Kansas City, Missouri: $[ ]. *See* September 27, 2004 Blue Dot Supp. Submission.

3. Olgoonik is a wholly owned subsidiary of Olgoonik Development, LLC, a holding company that is wholly owned by Olgoonik Corporation, an Alaska Native Corporation formed under the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601, *et seq.*, owned by members of the Inupiat Eskimo Tribe. *See* AR at 330. Olgoonik's principal place of business is in a HUBZone in Wainwright, Alaska. *Id.*

4. Waste Management, Inc. is a Delaware corporation with its principal office in Houston, Texas. *See United States and State of Florida v. Waste Management, Inc.*, No. 1:03CV02076 (D.D.C. Oct.

Dot would not be substituted as the awardee because its bid was "not 'number two' or the best value offeror, [and] technical proposal and past performance ratings were only marginal." AR 411–12. On December 12, 2002, the Air Force terminated the Contract No. F45613–02–D–A001 with Olgoonik. *See* AR at 483–84, 511.

**B. 2002–2004 Proceedings Before The General Accounting Office Concerning The Department Of Air Force's Solicitation Nos. F45613–02–Q–A027 And F45613–03–Q–A028 And Sole-Source Solicitation No. F45613–03–Q–A068.**

On November 18, 2002, Waste Management—Washington faxed the Air Force

pages one and eighteen of an undated Certificate of Convenience and Necessity ("Certificate"), issued by the State of Washington's Utilities and Transportation Commission ("WUTC"), stating that Waste Management—Washington had a license to collect solid waste in the Fairchild AFB area. *See* AR at 407–10. In fact, a WUTC Certificate for the territory, including Fairchild AFB, was transferred on June 24, 1999 from John W. Gillingham, Jr. to Waste Management—Washington. *See* AR 408; *see also* September 27, 2004 Waste Management—Washington Supp. Submission at 2 (Order M.V.G. No. 1863).[5] When Waste Management—Washington received this Certificate, however, the WUTC cautioned that "the Commission in granting authority for the transfer of rights

14, 2003) (complaint issued under 15 U.S.C. §§ 18, 25 for injunctive relief to block the proposed acquisition of Allied Waste Industries, Inc. by Waste Management, Inc.) at ¶ 9. Waste Management, Inc. is the nation's largest waste hauling company, providing waste collection and disposal services throughout the United States. *Id.* In 2002, Waste Management, Inc. reported total revenues of approximately $11.1 billion. *Id.* Waste Management, Inc. also is a holding company that conducts all of its operations through subsidiaries. *See* 2003 Waste Management, Inc. Annual Report at 32. Waste Management—Washington is one of those subsidiaries organized in 1999 under the laws of the State of Delaware. *See* 2003 Waste Management, Inc. SEC Form 10–K at Subsidiaries of the Registrant.

**5.** A number of related companies to Waste Management—Washington have acquired WUTC Certificates by transfer, *e.g.*, Washington Waste Hauling & Recycling, Inc. of Kirkland, Washington holds a Certificate issued by the WUTC reciting over twenty subsequent transfers of authority from December 14, 1999 to date, from other solid waste collection companies throughout the State of Washington *(i.e.,* "transfer of Certificate G–140 from Waste Management of Seattle, Inc. d/b/a/ Waste Management of Ellensburg/Waste Management of Kennewick" concerning territory in City of Seattle and King, Pierce, Snohomish, Kitsap, and Benton Counties; "transfer of certificate G–5 standing in the name of Ellensburg Disposal, Inc." concerning territory in Kittitas, King, Grant, and Benton Counties and the Department of Energy Hanford Site; "transfer of certificate G–126 from Waste Management—Sno–King, Inc." concerning territory in King, Snohomish, Pierce, Mason, Kitsap, Jefferson and Clallam Counties and the City of Seattle; "transfer of certificate G–39 from Waste Management of Spokane, Inc." concerning territory in Spokane, Grant, Okanogan, and Stevens Counties;

"transfer of certificate G–63 from Waste Management—Rainier, Inc." concerning territory in King County and City of Renton; "transfer of certificate no. G–43 from Waste Management Northwest, Inc." concerning territory in Snohomish and King Counties; "transfer of certificate no. G–117 from Waste Management of Ellensburg, Inc. d/b/a Waste Management of Greater Wenatchee" concerning territory in Chelan County; "transfer of certificate no. G–80 from Waste Management of Greater Wenatchee, Inc." concerning territory in Chelan and Grant Counties; "transfer of certificate no. G–67 from Washington Disposal Co., Inc." concerning territory in King County; "transfer of certificate no. G–81 from Waste Management of Kennewick, Inc." concerning territory in Benton County; "transfer of certificate no. G–135 from Richard D. Harris" concerning territory in the Town of Concrete, Skakit County and Whatcom County; "transfer of certificate no. G–156 from John W. Gillingham, Jr." concerning territory in Spokane County; "transfer of certificate no. G–91 from Stanwood Camano Disposal, Inc." concerning territory on Camano Island, Island County; "transfer of certificate no. G–73 from Environmental Waste of Skagit County, Inc." concerning territory in Whatcom and Skagit Counties; "transfer of certificate no G–16 from Nick Raffo Garbage Co., Inc." concerning territory in King County; "transfer of certificate no. G–35 from Federal Way Disposal Co., Inc." concerning territory in King and Pierce Counties; "transfer from G–12" concerning territory in the City of Federal Way; "transfer of certificate no. G–185 from RST Disposal Co., Inc." concerning territory in King County and the City of Kent; "transfer from G–126, standing in the name of Snoking Garbage Co., Inc." concerning territory in King County; "all of the authority obtained by a portion transfer of certificate G–63 standing in the name of Rainier Disposal Co., Inc."; "transfer of certificate no. G–126, standing in the name of

under a solid waste certificate does not necessarily approve the amount involved in the transaction, nor does it bind itself to recognize such amount in placing a value for rate-making purposes on the property of the certificate holder." September 27, 2004 Waste Management Supp. Submission at 2 (Order M.V.G. No. 1863).[6]

On December 2, 2002, Blue Dot filed a protest with the General Accounting Office ("GAO") challenging the Air Force's decision to cancel Solicitation F45613–02–Q–A027 and allow Waste Management—Washington and its affiliate Olgoonik to continue to perform, rather than awarding the contract to Blue Dot. See AR at 414–23. On December 18, 2002, the Air Force issued a Justification and Approval for Other Than Full and Open Competition indicating that the Air Force was awarding Waste Management—Washington a Sole–Source Contract for solid waste collection and disposal services for the period March 1, 2003—September 30, 2003, with four option years. See AR at 565–66. On December 20, 2002, the Air Force requested that Blue Dot's protest be denied, because the Air Force was of the opinion that Waste Management—Washington was the only company that possessed (or would possess) the WUTC Certificate, required to perform solid waste collection and disposal services at Fairchild AFB. See AR at 569–75. On December 30, 2002, Ms. Allen, however, a WUTC Regulatory Analyst, advised Blue Dot by e-mail:

> If the federal contracting guidelines require the federal entity to contract with a small business, minority or woman-owned business etc. and the existing solid waste collection company cannot meet those guidelines then this could be used by the applicant as justification for the [WUTC] to authorize an additional certificate. But the [WUTC] could only do so after holding

a hearing to consider all of the issues of the application and concluding that the shipper/generator has a legitimate need for service that the existing company cannot meet.

AR at 625–26 (emphasis added). Ms. Allen's note also was provided to the GAO and Air Force. See AR at 613–26.

On February 13, 2003, the GAO dismissed Blue Dot's protest, because the Air Force agreed to reissue the Solicitation to HUBZone companies, rather than entering a Sole–Source Contract with Waste Management—Washington. See AR at 679–80. On March 13, 2003, the Air Force issued a Pre–Solicitation Notice to HUBZone companies that provoked Waste Management—Washington to file a protest with the GAO. See AR at 688, 690–94. On May 27, 2003, GAO dismissed Waste Management—Washington's protest as "premature," because the solicitation had not been issued. See AR at 709–14. On June 19, 2003, the Air Force issued a Pre–Solicitation Notice F45613–03–QA028 for a solid waste collection and disposal contract, specifying that it was a HUBZone set-aside. See AR at 716–18; see also 48 C.F.R. § 19.1305(a), (b) (requiring a contracting officer to set aside acquisitions exceeding the simplified acquisition threshold to HUBZone small business concerns when the contracting officer has a reasonable expectation that offers will be received from two or more small business concerns and award will be made at fair market price). This Pre–Solicitation Notice, however, also required that "[t]he successful offeror must have a permit issued by the Washington Utilities and Transportation Committee [sic] ('WUTC') in order to be determined a responsible contractor and eligible for contract award." AR at 716. On July 23, 2003, the Air Force issued Solicitation F45613–03–Q–A028 for HUBZone quali-

---

Sno–King Garbage Co., Inc." concerning territory in King County). See AR 489–510.

6. At a September 16, 2004 oral argument, Waste Management—Washington represented to the court that a public hearing was required before WUTC would transfer a Certificate. See TR at 51. The court requested that Waste Management—Washington's counsel provide a transcript of the WUTC proceedings regarding the transfer of the Certificate concerning the Fairchild AFB

area. See TR at 52. Subsequently, Waste Management—Washington advised the court that it could not provide such a transcript, "[b]ecause the public docket record received no responses during the public comment period, no proceeding was conducted on the transfer application; therefore, there is no transcript of proceedings." September 27, 2004 Waste Management—Washington's Supp. Submission (Cover Letter).

fied companies. *See* AR at 719–46. Again, Waste Management—Washington protested. *See* AR at 747–54. On August 6, 2003, the Air Force announced that it was taking "corrective action" by cancelling the pre-solicitation and suspending the due date. *See* AR at 756, 758. Waste Management—Washington then withdrew its protest. *See* AR at 759.

On September 22, 2003, the Air Force cancelled Solicitation No. F45613–03–Q–A028 and issued Pre–Solicitation Notice No. F45613–03–Q–A068 announcing that it intended to award Waste Management—Washington a Sole–Source Contract for the solid waste collection and disposal services at Fairchild AFB. *See* AR at 761–65. On December 2, 2003, the Air Force issued a "modification" to the Pre–Solicitation Notice requiring that, in order to be a "responsible offeror," one must have a WUTC Certificate, issued pursuant to Wash. Rev.Code § 81.77.040.[7] *See* AR at 772–73.

On December 18, 2003, the Air Force issued Sole–Source Solicitation No. F45613–03–QA068 to Waste Management—Washington. *See* AR 774–820. On December 29, 2003, Blue Dot filed a protest with the GAO arguing that Sole–Source Solicitation No. F45613–03–Q–A068 was not awarded in compliance with the requirements of the HUBZone set-aside. *See* AR at 779–80, 829–35. On March 1, 2004, the GAO dismissed Blue Dot's protest as untimely.[8] *See* AR at 846–48. On March 24, 2004, Waste Management—Washington was awarded Contract No. FA4620–04–D–A003, based on Solicitation F45613–03–Q–A068, to provide solid waste collection and disposal services for Fairchild AFB. *See* AR at 850–93. Although the Air Force sent a Notice of Total Termination for Convenience of the Government to Olgoonik on December 16, 2002 and advised Olgoonik of the Air Force's intent to "reprocure recycling services as a sole source HUBZone, 8(a) set-aside with Olgoonik," the Administrative Record does not include the required Justification and Approval for Other Than Full and Open Competition. *See* AR at 562. Nevertheless, Contract No. FA4620–04–D–A003 incorporated a subcontracting plan with Olgoonik for residential recycling collection services at military family housing areas. *See* AR at 887–93.

On April 1, 2004, Waste Management—Washington commenced performance on Contract No. FA4620–04–D–A003. *See* AR at 857, 884.

## C. 2004 Proceedings Before The United States Court Of Federal Claims.

On April 12, 2004, Blue Dot filed a Complaint in the United States Court of Federal Claims alleging a "violation of statute and regulation [and] arbitrary and capricious action by [a] contracting officer." Compl. (Count I). By this Complaint, Blue Dot seeks: "preliminary and permanent injunctions enjoining the Air Force from awarding a Sole–Source Contract to Waste Management, Inc.," *see* Compl. ¶ 1 (Prayer for Relief); and an "[o]rder that the Air Force award the contract to Blue Dot Energy Company," *see* Compl. ¶ 3 (Prayer for Relief); or an "order that the solicitation be re-opened and that the procurement be set-aside for HUBZone small business concerns only." *See* Compl. ¶ 4 (Prayer for Relief).

On April 20, 2004, Waste Management—Washington filed a motion to appear as defendant-intervenor in this case. On April 21, 2004 the Administrative Record was filed. A telephone status conference was convened by the court on April 22, 2004, at which time the parties agreed to first address the issue of Blue Dot's standing. During that conference, the court orally granted Waste Management—Washington's motion to intervene,

---

7. References herein to relevant statutes of the State of Washington are cited from the Revised Code of Washington ("Wash.Rev.Code"). References herein to the regulations that implement provisions of the Wash. Rev.Code are cited from the Washington Administrative Code ("Wash.Admin.Code").

8. Blue Dot was required to protest Solicitation No. F45613–03–Q–A028 within 10 days after the basis of the protest was known or should have been known, *i.e.,* the date of the pre-solicitation notice issued on September 22, 2003. *See* AR at 848; *see also* 4 C.F.R. § 21.2(a)(2) ("Protests ... shall be filed not later than 10 days after the basis of protest is known or should have been known (whichever is earlier)[.]").

which was confirmed by a written order on April 27, 2004.

On May 3, 2004, the Government filed a motion to dismiss, pursuant to RCFC 12(b)(1). On May 18, 2004, Waste Management—Washington filed a supplement to the Government's motion to dismiss. On May 27, 2004, Blue Dot filed a response. On June 14, 2004, the Government filed a reply. On July 1, 2004, Blue Dot filed a notice of supplemental filing. The Government filed a response on July 19, 2004.[9]

On August 18, 2004, the court issued a Memorandum Opinion Regarding Plaintiff's Standing and Order to Show Cause, wherein the court decided that Blue Dot's standing should not be resolved on a motion to dismiss. *See Blue Dot Energy Company, Inc. v. United States,* 61 Fed.Cl. 548, 554 (2004). The parties also were ordered to show cause why the court should not enter an order that Blue Dot has a "substantial chance" at least of receiving Contract No. FA4620–04–D–A003's option years, since the Air Force had admitted that its interpretation of 42 U.S.C. § 6961(a) and Wash. Rev.Code § 81.77.040 knowingly was contrary to law. *Id.* at 554–56. In addition, the parties also were ordered to show cause why the court should not rule that Blue Dot has a "substantial chance" of obtaining Contract No. FA46020–02–04–D–A003's option years, since Wash. Rev.Code § 81.77.040 has been utilized in violation of federal antitrust law. *Id.* at 556–57.

On September 13, 2004, Blue Dot, the Government, and Waste Management—Washington filed responses. In addition, the Government filed on that date a Motion for Judgment Upon the Administrative Record, pursuant to RCFC 56(1) ("Gov't Brief"). Waste Management—Washington also filed a Motion for Judgment Upon the Administrative Record, pursuant to RCFC 56(1) ("Waste Management—Washington Brief"). On September 14, 2004, Waste Management—Washington filed a Motion to Amend to correct certain clerical errors.

On September 16, 2004, an oral argument was held at the United States Court of Federal Claims, Washington, D.C. At the conclusion of the argument, Blue Dot and Waste Management—Washington were requested by the court to file certain supplemental materials. *See Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1338–39 (Fed.Cir.2001) (permitting supplementation of the Administrative Record when the record is insufficient for the court to render a decision). In response, on September 27, 2004, Blue Dot filed a motion to supplement the Administrative Record by the submission of other contracts that Blue Dot has with the Government, including: Contract No. F14614–02–C–0003 at McConnell Air Force Base, Wichita, Kansas; Contract V255P(452)–0014 and Contract No. V255C(589)–0197 with the Department of Veterans Affairs in Wichita, Kansas. On September 27, 2004, Waste Management—Washington also supplemented the Administrative Record by providing requested documents concerning its acquisition of the WUTC Certificate for the territory of Fairchild AFB, including the docket of Permanent Operating Authority Applications Pending, dated May 10, 1999, WUTC Order M. V.G. No. 1863 Granting Application, Cancelling Certificate No. G–156, Amending Certificate G–237, and Joint Application of John W. Gillingham, Jr. and Washington Waste Hauling & Recycling, Inc.

The base year of Contract FA4620–04–D–A003 expired on September 30, 2004. Although the Air Force exercised the first of four option years to continue the contract with the Waste Management—Washington, the Air Force and Waste Management—Washington subsequently agreed that the first option will continue only on a month-to-month basis pending final disposition of this case. *See* TR at 5.

## DISCUSSION

### A. Jurisdiction.

The court has determined that Blue Dot's April 12, 2004 Complaint objecting to the

---

**9.** All of these documents were filed under seal, however, the court has determined that none of the information and legal analysis therein requires confidential treatment, other than certain information on pages 5 (lines 2 and 5) and 9 (lines 10 and 12) of the Government's May 3, 2004 Motion to Dismiss.

award of a contract properly alleges a claim over which the court has jurisdiction, pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1), as enacted as part of the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 St. 3870, 3874–75 (1996). *See Blue Dot Energy Co., Inc.,* 61 Fed.Cl. at 552. Under the Tucker Act, as amended, the court also has jurisdiction to adjudicate "any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b)(1).

## B. Standing.

### 1. Blue Dot Has Established That It Is An "Interested Party."

As a threshold matter, a protestor must establish that it is "an interested party." 28 U.S.C. § 1491(b)(1). A two-part test has been applied by the United States Court of Appeals for the Federal Circuit to determine whether a protestor may be deemed an "interested party": 1) the protestor must show a connection to the procurement; and 2) the protestor must have an economic interest in the procurement. *See American Fed'n Gov't Employees, AFL–CIO v. United States,* 258 F.3d 1294, 1302 (Fed.Cir.2001) ("We ... hold that standing under [28 U.S.C.] § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."); *cf.* 31 U.S.C. § 3551(2) (for purposes of review by the GAO an "interested party [is] an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

In this case, Blue Dot was an offeror for Solicitation No. F45613–02–Q–A027 concerning solid waste collection and disposal services at Fairchild AFB initially that was set aside under the HUBZone Small Business Program. *See AR 1, 150–77; see also* 15 U.S.C. § 657a. Because the Air Force cancelled Solicitation No. F45613–02–Q–A027 and later Solicitation No. F45613–03–Q–A028, and instead issued Sole–Source Solicitation No. F45613–03–Q–A068, to avoid awarding the contract under the HUBZone program, Blue Dot had a "connection" to the

procurement, but also lost the economic opportunity of being awarded the contract with a value of approximately $[ ]. Therefore, Blue Dot has established a significant economic interest in Sole–Source Solicitation No. F45613–03–Q–A068 and Contract No. FA4620–04–D–A003 to qualify as an "interested party." *See Impresa,* 238 F.3d at 1334 (holding that, if the government is obligated to rebid the contract, and the unsuccessful bidder could compete for the contract once again and, therefore, has an economic interest and standing to challenge the award); *MCI Telecommunications Corp. v. United States,* 878 F.2d 362, 364–65 (Fed.Cir.1989) (a prospective bidder is one "expecting to submit an offer prior to the closing of the solicitation" and if the protest could reopen the solicitation, the offeror would submit a bid.); *cf* 31 U.S.C. § 3551(2) (2000) (The CICA defines an "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract.").

### 2. Blue Dot Has Established That It Has Been "Prejudiced."

Since "the question of prejudice goes directly to the question of standing, prejudice must be reached before addressing the merits." *Information Tech. & Applications Corp. v. U.S.,* 316 F.3d 1312, 1319 (Fed.Cir. 2003); *see also National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1053 (D.C.Cir.1989) ("Not every bidder in a solicitation may assert disappointed bidder standing, otherwise nuisance suits could handicap the procurement system."). Our appellate court specifically requires that "[w]hen a party contends that the procurement procedure in a sole-source case involved a violation of a statute, regulation, or procedure, it must establish prejudice by showing that it would have had a substantial chance of receiving the award." *Myers Investigative & Sec. Servs., Inc. v. United States,* 275 F.3d 1366, 1370 (Fed.Cir.2002) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir. 1996)).

Panels of the United States Court of Appeals for the Federal Circuit, however, have

taken different approaches regarding the evidence required to satisfy the "substantial chance" doctrine. *Compare Information Tech. & Applications Corp.,* 316 F.3d at 1319 (a protestor must establish that its chance of winning the award was "greater than . . . insubstantial . . . if successful on the merits of the bid protest."); *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562–63 (Fed.Cir. 1996) (holding "the appropriate standard is that, to establish prejudice, a protestor must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protestor would have been awarded the contract. This is a refinement and clarification of the 'substantial chance' language[.]") *with United States v. Int'l Bus. Machines Corp.,* 892 F.2d 1006, 1011 (Fed.Cir.1990) ("[O]nly the second-lowest bidder has a direct economic interest in the award of the contract. Therefore, only the second-lowest bidder is an interested party entitled to protest the award of the contract, . . . because only it stands to receive the contract in lieu of the challenged awardee[.]") (internal citation omitted). *See* Frederick W. Claybrook, Jr., "Standing, Prejudice, and Prejudicing Bid Protest Cases," 33 PUBLIC CONTRACT LAW JOURNAL 535, 564 (Spring 2004) (criticizing the United States Court of Appeals for the Federal Circuit for "improperly merg[ing] the injury-in-fact requirement for standing and the need to show prejudice once a procurement error is demonstrated on the merits.").

■ In *Impresa,* the United States Court of Appeals for the Federal Circuit, however, spoke directly to the relationship between a "responsibility determination" and the substantial chance doctrine, *i.e.,* if a "bid protest were allowed because of an arbitrary and capricious responsibility determination by the contracting officer, the government would be obligated to rebid the contract, and [the challenging bidder] could compete for the contract once again. Under these circumstances, the [challenging bidder] has a 'substantial chance' of receiving the award and an economic interest and has standing to challenge the award." *Impresa,* 238 F.3d at 1334 (citing *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir. 1999)) (holding that a protester is not re-

quired to show that, but for the alleged error, the protester would have been awarded the contract; instead a protester must show there was a substantial chance it would have received the contract but for the alleged error). Therefore, to establish bid protest standing, the plaintiff at least must demonstrate that it "could compete for the contract," if the bid process were made competitive. *Id.; see also Myers,* 275 F.3d at 1370–71 (stating that the plaintiff "must show that it would have been a qualified bidder[,]" but it does not have to "show that it would have received the award in competition with other hypothetical bidders[.]").

■ In this case, if the Air Force was obligated to resolicit the Contract No. FA4620–04–D–A003 competitively as a HUBZone small business set-aside, then Blue Dot, as a certified HUBZone small business concern, would be eligible to compete for such contract.

The Government argues that Blue Dot lacked "interested party" status to protest Solicitation Nos. F45613–03–Q–A027 and F45613–03–Q–A068, because its proposal was not in the "competitive range." *See* Gov't Brief at 25. This argument, however, more appropriately is considered under the "reasonable likelihood of success" test to determine whether the protestor can establish prejudice. *See Data General Corp.,* 78 F.3d at 1562–63. Blue Dot successfully blocked the Air Force's award of Solicitation No. F45613–02–Q–A027 to Olgoonik, thereby causing the Air Force to terminate that contract. *See* AR at 411–12, 476, 479–80, 483–84. Therefore, when Solicitation No. F45613–02–QA027 was rebid, Blue Dot should have been the successful bidder since the Air Force's concerns about Blue Dot's "past performance" primarily concerned the operation of the recycling center. *See* AR at 213–14, 216, 218. The dispute at issue, however, concerns Sole–Source Solicitation No. F45613–03–Q–A068, which only covers solid waste collection and disposal services, not the operation of a recycling center. *See* AR at 3, 781. Therefore, the Air Force's 2002 evaluation of Blue Dot is irrelevant to whether Blue Dot was prejudiced by the Air Force's can-

cellation of Solicitation Nos. F45613–02–Q–A027 and F45613–03–Q–A028 and decision to issue Sole–Source Solicitation No. F45613–03–Q–A068 and Contract No. FA4620–04–D–A003 to Waste Management—Washington. Based on this record, there is no question that Blue Dot was prejudiced by the Air Force's decision and that it has standing to bring this action. *See Impresa,* 238 F.3d at 1334.

## C. Relevant Standards Of Review.

### 1. In Bid Protest Cases.

Bid protest actions are reviewed under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* *("APA"),* which provides that:

> The reviewing court shall—... hold unlawful and set aside agency action, findings, and conclusions found to be—... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]

5 U.S.C. § 706(2)(A); *see also NVT Techs., Inc. v. United States,* 370 F.3d 1153, 1159 (Fed.Cir.2004) (holding that "an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' "); *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1329 (Fed.Cir.2004) (holding that in bid protest cases, " 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.' "); *Impresa,* 238 F.3d at 1332 (holding that "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."). To prevail on a challenge that the procedure utilized in a procurement involved a violation of regulation or procedure, plaintiff must "show 'a clear and prejudicial violation of applicable statutes or regulations.' " *Id.* at 1333 (quoting *Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)).

■ In deciding whether a procurement official's decision lacks a "rational basis," the court's inquiry should "determine whether 'the contracting agency provided a coherent and reasonable explanation for its exercise of discretion.' " *Impresa,* 238 F.3d at 1332–33; *see also Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)) ("[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.' "); *see also Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044, 1046 (Fed.Cir.1994) (recognizing that "Government agencies are entrusted with a good deal of discretion in making procurement decisions.").

### 2. Judgment On Administrative Record.

Rule 56.1 of the United States Court of Federal Claims provides that a motion for judgment on the administrative record will be treated under the same standard as Rule 56(a)-(b). *See* RCFC 56.1; *see also Banknote Corp. of America, Inc. v. United States,* 365 F.3d 1345, 1352 (Fed.Cir.2004) ("[J]udgment on the administrative record is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law."). In reviewing agency procurement decisions, a motion for judgment on the Administrative Record is appropriate, because such decisions usually involve interpretation of regulations or contracts and present no disputed issues of material fact. *Id.* at 1352 (holding that interpretation of contract documents, regulations, or a solicitation present no disputed issues of material fact and is a question of law).

### 3. For A Permanent Injunction.

The standard for a permanent injunction is the same as that for preliminary injunction, except the plaintiff must show actual success on the merits instead of a likelihood of success on the merits. *See Amoco Prod. Co. v. Village of Gambell, AK,* 480 U.S. 531, 546 n.

12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In addition, the plaintiff must establish: irreparable harm; the balance of the hardship favors the plaintiff; and a "tolerable effect on the public interest." *Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.*, 74 F.3d 1216, 1219 (Fed.Cir.1996) (holding that the "court must balance these factors against one another and against the extent of the relief sought" and "movant bears the burden of proving entitlement to relief.") (citing *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555–56 (Fed.Cir.1994)); *see also FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir. 1993) (holding that no one factor is determinative and "the weakness of ... one factor may be overborne by the strength of the others.").

**D. Resolution Of The Government's And Waste Management—Washington's Motions For Judgment On The Administrative Record.**

**1. Applicable Law.**

**a. Requirements Of The Competition In Contracting Act.**

The CICA requires that executive federal agencies procure property or services to "obtain full and open competition through the use of competitive procedures[.]" *See* 10 U.S.C. § 2304(a)(1)(A). Toward that end, Section 2305(b)(3) of the CICA requires that an award of federal contracts be made only "to the *responsible bidder* whose bid *conforms* to the solicitation and is most *advantageous* to the United States, *considering only price* and other price-related factors included in the solicitation." 10 U.S.C. § 2305(b)(3) (emphasis added).

Nevertheless, Section 2304(c)(1) of the CICA provides that "[t]he head of an agency may use procedures other than competitive procedures only when—(1) the property or services needed by the agency are *available from only one responsible source* or only from a limited number of responsible sources and *no other type of property or services will satisfy the needs of the agency.*" 10 U.S.C. § 2304(c)(1) (emphasis added). In addition, Section 2304(c)(5) provides that "[t]he head of an agency may use procedures other than competitive procedures only when—(5) ... a

statute expressly authorizes or requires that the procurement be made through another agency or from a specified source[.]" 10 U.S.C. § 2304(c)(5).

**b. Requirements Of Federal Acquisition Regulations.**

**i. A "Responsible Bidder" Determination Concerns The Offeror's Ability To Properly Perform The Contract Work.**

A "responsible bidder determination involves the question of whether the contractor *can or will perform as it has promised,* and the contracting officer is accorded a great deal of discretion." John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 545 (3d ed. 1998) ("CIBINIC AND NASH") (emphasis added). For a contracting officer to make a "responsible bidder" finding, the offeror must:

(a) Have adequate financial resources to perform the contract, or the ability to obtain them ...;

(b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;

(c) Have a satisfactory performance record;

(d) Have a satisfactory record of integrity and business ethics;

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or *the ability to obtain them....*

(f) Have the necessary production, construction, and technical equipment and facilities or *the ability to obtain them ...;* and

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

48 C.F.R. § 9.104–1 (emphasis added); *see also* 48 C.F.R. § 9.103(b) ("No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility."); *see also VMS Hotel Partners v. United States*, 30 Fed.Cl. 512, 514 (1994) (stating that the "responsibility" determination focuses on an offeror's ability to

satisfy contractual obligations contained in its bid); *LORS Med. Corp.*, Comp. Gen. Dec. B–259829, 95–1 CPD ¶ 222, 1995 WL 246080 (Apr. 25, 1995) (requiring submission of information regarding company's policies and procedures is a "responsibility" determination); *Employers Sec. Co.*, GSBCA No. 6917, 85–1 BCA ¶ 17,885, 1985 WL 16383 (Jan. 31, 1985) (a requirement that a bidder possess an operating license is a "responsibility" determination); *Lithographic Pubs. Inc.*, Comp. Gen. Dec. B–217263, 85–1 CPD ¶ 357, 1985 WL 52543 (Mar. 27, 1985) (providing that a government contract term could not convert a matter of "responsibility" into one of "responsiveness"). Moreover, the contracting officer does not have to confine a determination of "responsibility" to the information in the bid, but may request additional information solely to allow the offeror to demonstrate responsibility. *See VMS Hotel Partners,* 30 Fed.Cl. at 514.

"Special standards" or "definitive performance criteria," are utilized instead of "general standards" " 'when experience has demonstrated that unusual expertise or specialized facilities are needed for adequate contract performance.' " 185 F.3d 1297, 1301 (Fed. Cir.1999) (citing 48 C.F.R. § 9.104–2(a)). Contract solicitations, however, must have "a rational relationship to agency needs, ... not be unduly restrictive[,] and ... written in as non-restrictive a manner as possible in order to enhance competition and invite innovation." *Wit Assocs., Inc. v. United States,* 62 Fed.Cl. 657, 662 (2004); *see also ABF Freight Sys., Inc.,* 55 Fed.Cl. at 395 (requiring that solicitations have a rational relationship to an agency needs but be written in a non-restrictive way to enhance competition and not be unduly restrictive). The restrictive provisions may be included in a contract solicitation, but only to the extent necessary to satisfy the needs of the agency or as authorized by law. *See* 10 U.S.C. § 2305(a)(1)(B)(ii); *see also* 48 C.F.R § 14.101(a) ("Unnecessarily restrictive specifications or requirements that might unduly limit the number of bidders are prohibited."); *Fed. Data Corp. v. Dept. Of Justice,* GSBCA No. 12264–P, 94–1 B.C.A. ¶ 26,324, 1993 WL 306145 (Mar. 25, 1993) (solicitations must have a rational basis for agency needs and not be unduly restrictive); *Inte-*

*grated Sys. Group, Inc. v. Dept. of Navy,* GSBCA No. 12127–P, 93–2 B.C.A. ¶ 25,637, 1992 WL 360143 (Nov. 30, 1992) (holding that justification for "only new" equipment in procurement lacked rationale for why used or refurbished equipment would not meet the agency's minimum needs and requiring procurement in a manner designed to achieve maximum competition).

### ii. A Determination Regarding "Responsiveness" Concerns Issues Of Bid Conformity To The Material Terms Of A Solicitation.

Responsiveness is "an area in which the contracting officer has limited discretion [and], deals with the question of whether the contractor *has promised to do exactly what the Government has* requested." CIBINIC AND NASH 545 (emphasis added). In determining "responsiveness," a contracting officer must identify whether an offeror's bid evidences the ability to comply in all material respects with the solicitation's requirements. *See* 48 C.F.R. § 14.301(a); *see also News Printing Co., Inc. v. United States,* 46 Fed. Cl. 740, 745 (2000) (responsiveness focuses on the bid and commitment to meet the material terms of an invitation for bids); *see also VMS Hotel Partners,* 30 Fed.Cl. at 514 (explaining that "responsiveness" focuses on a solicitation's requirements and whether an offeror has agreed to conform in all material respects to such requirements). "Responsiveness" determinations are made by the contracting officer based on the contents of a bid at the time of opening. *Id.*

### c. Requirements Of The Resource Conservation And Recovery Act Of 1976.

The Resource Conservation and Recovery Act of 1976 ("RCRA"), provides, in relevant part:

Each department, agency, and instrumentality of the executive, legislative, and judicial branches of the Federal Government ... engaged in any activity resulting, or which may result, in the disposal or management of solid waste or hazardous waste shall be subject to, and *comply with, all Federal,* State, interstate, and local *requirements, both substantive and procedural* (including any requirement for permits or reporting ... ), respecting control

and abatement of solid waste or hazardous waste disposal and management in the same manner, and to the same extent, as any person is subject to such requirements, including the payment of reasonable service charges.

42 U.S.C. § 6961(a) (emphasis added).

### d. Requirements Of Wash. Rev.Code § 81.77.

In 1961, the State of Washington enacted a law providing that:

*[n]o solid waste collection company shall hereafter operate* for the hauling of solid waste for compensation without first having obtained from the commission a certificate declaring that public convenience and necessity require such operation.... Issuance of the certificate of necessity shall be determined upon, but not limited to, the following factors: The present service and cost thereof for the contemplated area to be served; an estimate of the cost of the facilities to be utilized in the plant for solid waste collection and disposal; ... a statement of prior experience, if any, in such field by the petitioner; ... and sentiment in the community contemplated to be served as to the necessity for such a service.... [W]hen an applicant requests a certificate to operate in a territory already served by a certificate holder under this chapter, the commission may, after hearing, issue the certificate only if the existing solid waste collection company or companies serving the territory will not provide service to the satisfaction of the commission.

Wash. Rev.Code § 81.77.040 (emphasis added). *See generally,* Wash. Rev.Code Chapter 81.77 (applies to "Solid Waste Collection Companies.").

### 2. The Air Force's Decision To Issue Sole–Source Solicitation No. F45613–03–QA068 And Award Waste Management—Washington Contract No. FA4620–04–DA003 Was Contrary To Law.

### a. The Air Force's Interpretation Of 42 U.S.C. § 6961(a) And 10 U.S.C. § 2304(c)(1) Was Contrary To Law.

 The Air Force issued Sole–Source Solicitation Notice No. F45613–03–Q–A068 and did not set it aside under the HUBZone Small Business Program, based on an interpretation that 42 U.S.C. § 6961(a) required the Air Force to issue any contracts for solid waste collection and disposal services, pursuant to the "only responsible source" provision of 10 U.S.C. § 2304(c)(1), if only one contractor possessed a WUTC Certificate at the time the bid was submitted. That interpretation was contrary to law.

On December 10, 2003, the Air Force issued a "REVISED/FINAL JUSTIFICATION AND APPROVAL FOR OTHER THAN FULL AND OPEN COMPETITION" ("Final Justification") regarding a "new contract for solid waste collection and disposal services [to] be awarded on a restrictive basis to Waste Management of WA[.]" AR at 774. The Final Justification states at "Section 5 DEMONSTRATION THAT THE CONTRACTOR'S UNIQUE QUALIFICATIONS OR NATURE OF THE ACQUISITION REQUIRES THE USE OF ONLY ONE RESPONSIBLE SOURCE AUTHORITY:"

Under Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6961 (Application of Federal, State, and local law to Federal facilities), federal agencies must comply with local solid waste management regulations. As such, *exclusive* franchise agreements, *certificates, or authority granted by a state,* county, or municipality *to an entity prevents federal agencies from competing the contract requirements.* The WUTC has the authority to grant companies certificates of public convenience and necessity, which grant them authority to operate solid waste collection services within a prescribed geographic area. Waste Management holds Certificate No. G–156 dated 12–14–99 for the area surrounding and including Fairchild AFB. In matter of: *Red River Service Corporation,* B–279250, May 26, 1998, 98–1 Comp. Gen. Proc. Dec. P142, at footnote 2, GAO specifically held that RCRA was an express requirement under 10 U.S.C. § 2304(c)(5). Although GAO cited 10 U.S.C. § 2304(c)(5), that authority does

not identify the specific entity involved. Therefore, we are using 10 U.S.C. § 2304(c)(1) as the statutory authority for this procurement.

AR at 775 (emphasis added).

In addition, the Final Justification provides: "Section 6 DESCRIPTION OF EFFORTS MADE TO ENSURE THAT OFFERS ARE SOLICITED FROM AS MANY POTENTIAL SOURCES AS DEEMED PRACTIBLE [sic]:"

> This acquisition was synopsized as other than full and open competition on 22 September 2003. In accordance with current applicable laws, regulations, and the GAO ruling *In the matter of Red River Service Corporation,* competition for solid waste collection and disposal does not appear possible since Waste Management is currently the only refuse contractor that holds an exclusive certificate issued by the WUTC for the geographic area that includes Fairchild AFB. If other refuse haulers can a [sic] obtain certificate from the WUTC for this geographic area and submits proposals, the proposals will be considered for award.

AR at 776. The Final Justification also stated, "Section 10 A LISTING OF SOURCES, IF ANY, THAT EXPRESSED, IN WRITING, AN INTEREST IN THE ACQUISITION:"

> Offerors on the previous solicitation are expected to show an interest in this procurement, however, they will not be eligible to compete as prime contractors without a certificate for this geographic area issued by the WUTC.

AR at 777.

The Government and Waste Management—Washington argue that the Air Force's decision to issue Sole–Source Solicitation No. F45613–03–Q–A068 was mandated by: 42 U.S.C. § 6961(a) and 10 U.S.C. § 2305(b)(3); *Parola v. Weinberger,* 848 F.2d 956 (9th Cir.1988); and *Red River Service Corp.,* Comp. Gen. Dec. B–279250, 98–1 CPD ¶ 142, 1998 WL 267083 (May 26, 1998). *See* Gov't Brief at 6–14; Waste Management—Washington Brief at 19–20. First, Section 2304(c)(5) of the CICA provides that noncompetitive procedures may be utilized when "a

statute expressly authorizes or requires that the procurement be made ... from a specified source[.]" 10 U.S.C. § 2304(c)(5). Neither 42 U.S.C. § 6961(a) nor Wash. Rev.Code § 81.77, however, require that the procurement of solid waste collection and disposal services at Fairchild AFB "be made" from any specified company. In fact, Wash. Rev. Code § 81.77.040 imposes no legal duty on the Air Force, but requires only that a solid waste collection company have a WUTC Certificate at the time *performance under the contract commences operation. See* Wash. Rev.Code § 81.77.040 ("[n]o solid waste company shall hereafter *operate.")* (emphasis added). Therefore, the Air Force is not constrained either by 42 U.S.C. § 6961(a) or Wash. Rev.Code § 81.77.040 from soliciting the lowest bid for such services in compliance with Section 2305(b)(3) of the CICA.

Waste Management—Washington contests that Section 2305(c)(5) is relevant to the Final Justification since that portion of the CICA states that Section 2304(c)(1) of the CICA is the authority under which Sole–Source Solicitation No. F45613–03–Q–A068 was issued. *See* 10 U.S.C. § 2304(c)(1) ("The head of an agency may use other than competitive procedures only when—... (1) the property or *services* needed by the agency are *available from only one responsible source* or only from a limited number of responsible sources *and no other type of property or services* will satisfy the needs of the agency[.]") (emphasis added). There is, however, no language in either 42 U.S.C. § 6961(a) nor Wash. Rev.Code § 81.77.040 that requires that solid waste collection services "are available from only one ... source." 10 U.S.C. § 2304(c)(1).

In this case, the Air Force's decision to issue Sole–Source Solicitation No. F45613–03–QA068 and award Contract No. FA4620–04–D–A003 to Waste Management—Washington was made on the unlawful assumption that Waste Management—Washington was the only offeror that had a WUTC Certificate at the time the Solicitation was issued. *See* AR at 775–76. Although the Air Force ultimately is responsible for its decision to proceed in this manner, Waste Management—Washington was not a mute bystander, since

it knowingly misrepresented to the Air Force that "Fairchild Air Force Base was violating federal law if it contracted with any party other than Waste Management for solid waste collection." AR 305; *see also* AR at 486. Moreover, the fact that the Air Force adopted this rationale, despite the fact the Air Force admitted that *"it conflicts with the Federal Acquisition Regulations (FAR), most specifically subpart 19.5, as well as the full and open competition requirements of the Competition in Contracting Act of 1984 (CICA)."* (emphasis added), establishes the unlawful and prejudicial nature of the Air Force's decision to issue Sole–Source Solicitation No. F45613–03–Q–A060 and award Contract No. FA4620–04–D–A003 to Waste Management—Washington.

The Government and Waste Management—Washington's reliance on *Parola* likewise is equally misplaced. In that case, the City of Monterey enacted Ordinance No. 2255 providing that "the occupant of each premises within the City upon which garbage, refuse, and rubbish is produced shall obtain and maintain disposal service by the City, its agents, or its franchisee[.]" *Id.* at 960. The United States Court of Appeals for the Ninth Circuit held that the state plan under which the Monterey Ordinance was enacted authorized the city to grant exclusive franchises and federal facilities were required to honor those exclusive franchises under RCRA. *Id.* at 962; *see also Solano Garbage Co. v. Cheney*, 779 F.Supp. 477, 480–81 (E.D.Cal.1991) (involving a city's authority for granting an exclusive franchise that was the same state plan in *Parola* and was clearly and expressly stated). *Parola*, however, contains no language that holds that RCRA requires an offeror to hold a state Certificate as a pre-requirement to bid on a federal contract. *See Parola*, 848 F.2d at 962. In fact, unlike the state solid waste plan in *Parola* that clearly authorized the issuance of exclusive franchises,[10] Wash. Rev.Code § 81.77 does not "clearly" or "expressly" do so. In fact, if the WUTC issued an exclusive

franchise under Wash. Rev.Code § 81.77, such action likely would be held to be unconstitutional, because in *In re Electric Lightwave, Inc.*, 123 Wash.2d 530, 869 P.2d 1045 (1994), the Supreme Court of the State of Washington held that the "language [of Wash. Rev.Code § 80.36.230, a statute similar to Wash. Rev.Code § 81.77, but providing the conditions for issuing telecommunication company franchises] does not confer the power to grant monopolies or exclusive rights[,]" and "[t]he Commission therefore lacks the authority under Wash. Rev.Code § 80.36.230 to grant exclusive rights to LECs." *Id.* at 1049–50. Moreover, the State of Washington's Supreme Court held that "the Legislature must expressly grant to the Commission the authority to grant monopolies before the Commission may exercise such rights," because the Washington State Constitution and case law "manifest the state's abhorrence of monopolies." *Id.* at 1050; *see also California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (holding that to establish antitrust immunity a "challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy' " and "the policy must be 'actively supervised' by the state itself"). The Legislature of the State of Washington has not added such a determination to date.

As for *Red River Service Corp.*, Comp. Gen. Dec. B–279250, 98–1 CPD ¶ 142, 1998 WL 267083 (May 26, 1998), the GAO held in that case only that 40 C.F.R. § 255.33 does not exempt a federal agency from the requirement that federal installations and agencies comply with local solid waste management regulations. *Id.* at *4. At issue was County of San Diego's Ordinance No. 8790 providing that "it is unlawful for any person to engage in the business of collection of solid waste kept, accumulated or produced in the unincorporated County unless a Solid Waste Management Agreement has been entered into and is in full force and effect." *Id.* at *1 n. 1. The Solicitation in that case contained a

---

**10.** The state plan authorizing the city ordinance in *Parola* provided, "Whether such [solid waste handling] services are to be provided by means of non-exclusive franchise, contract, license, permit, or otherwise, either with or without compet-

itive bidding, or ... by *partially exclusive* or *wholly exclusive* franchise, contract, license, permit or otherwise, either with or without competitive bidding." *Parola*, 848 F.2d at 962 (quoting Cal. Gov.Code § 66757) (emphasis added).

restriction that it was "limited only to those contractors who are eligible to, or currently have, a non-exclusive solid waste management agreement with the County of San Diego." *Id.* at *1. Therefore, the GAO held that it was proper for the solicitation to contain a clause requiring the *successful contractor* to comply with the San Diego ordinance and requiring that the contractor *have or be able to obtain* a solid waste management agreement with the County of San Diego. *Id.* at *6 (emphasis added). Accordingly, *Red River* supports Blue Dot's argument that neither 42 U.S.C. § 6961(a) nor Wash. Rev.Code § 81.77 requires that an offeror must have a WUTC Certificate in hand to be eligible to submit a bid or even to be determined a "responsive bidder;" instead the successful bidder must be able to meet this requirement by the time performance is commenced under the contract. *Id.* at *6.

In this case, WUTC did not issue Waste Management—Washington an "exclusive" Certificate, and Wash. Rev.Code § 81.77, as the County Ordinance in *Red River*, requires only that a solid waste contractor have been issued a proper license before it commences performance. For these reasons, the Air Force's December 10, 2003 Revised Final Justification, concluding that "exclusive franchise agreements, certificates, or authority granted by a state" with respect to local solid waste management regulations "prevents federal agencies from competing the contract requirements," was contrary to the applicable law regarding Sole–Source Solicitation No. F45613–03–Q–A068 and Contract No. FA4620–04–D–A003. *See* AR at 775.

### b. The Air Force's Imposition Of "Special Standards" In Sole–Source Solicitation No. F45613–03–Q–A068 Was Contrary To Law.

■ As a threshold issue, under the HUBZone Small Business Program, it is the SBA, not the Air Force, that has the authority "[t] o certify to Government procurement officers … with respect to *all elements of responsibility,* including, but not limited to, capability, competency, capacity, credit, integrity, perseverance, and tenacity, of any small business concern or group of such concerns to receive and perform a specific Government contract." 15 U.S.C. § 637(b)(7) (emphasis added). Therefore, neither 42 U.S.C. § 6961 nor Wash. Rev.Code § 81.77 require that a HUBZone small business have a WUTC Certificate in hand before it may submit a bid on a federal contract for solid waste collection services, as previously discussed. In fact, Wash. Rev.Code § 81.77 requires only that a solid waste collection company have a WUTC Certificate by the time performance commences.

The June 19, 2003 and December 2, 2003 Pre–Solicitation Notices, however, contained a "special standard," *i.e.,* the requirement that an offeror have a WUTC Certificate before it is eligible to submit a bid. *See* AR at 716–17, 772–73. In this case, the "special standard" imposed attempted to convert a "responsibility" requirement into a "responsiveness" requirement. *See* 48 C.F.R. § 9.104–1 (determining responsibility involves whether a prospective contractor has adequate financial resources, ability to comply with required performance schedule, a satisfactory performance record, integrity, ethics, necessary technical skills or ability to obtain them, necessary production equipment and facilities or ability to obtain them); 48 C.F.R. § 14.301 ("To be considered for award, a bid must comply in all material respects with the invitation for bids."); *see also Employers Sec. Co., Inc.,* GSBCA No. 6917, 85–1 BCA ¶ 17,885, 1985 WL 16383 (Jan. 31, 1985) (requirement that bidder possess an operating license properly relates to responsibility, notwithstanding solicitation language stating that it affects responsiveness).

The Air Force, by attempting to make a WUTC Certificate a "responsiveness" criteria, rather than a "responsibility" criteria, unlawfully precluded the SBA from exercising authority to make the responsibility determination as Congress intended. *See* CIBINIC AND NASH at 545 (A "responsible bidder" determination "cannot be converted into matters of responsiveness merely by inserting a provision [into a solicitation] requiring rejection of bids that do not comply."). The particularly offensive nature of the Air Force's action in this regard is evidenced by the fact that the SBA specifically advised the Air Force that it was

reasonable to assume that the WUTC would issue an additional certificate to a HUBZone small business for solid waste collection services at Fairchild AFB. *See* AR at 703b-c; *see also* AR at 625.[11] Therefore, the Air Force's imposition of "special standards" in Sole–Source Solicitation No. F45613–03–Q–A068 was contrary to law.

3. **The Air Force's Decision To Issue Sole–Source Solicitation No. F45613–03–QA068 And Contract No. FA4620–04–D–A003 Also Lacked A Rational Basis.**

a. **The Air Force's Determination That The "Critical Need" For Solid Waste Collection And Disposal Services Requires That An Awardee Possess A WUTC Certificate Prior To Performance Lacks A Rational Basis.**

■ The Government argues that the Air Force "reasonably desires that its awardee possess a certificate *before* performance of this contract begins because of the critical need for on-going, daily service of this contract." Gov't Brief at 23. Toward that end, the Air Force improperly "concluded that, if obtaining a WUTC certificate were a performance, not a responsibility, requirement, then the non-certificated awardee may be unable to actually perform for months after contract award, if ever." *Id.* at 23–24. The Air Force's determination, however, lacks a rational basis because Wash. Rev.Code § 81.77 contains specific provisions for expedited temporary certificates to address concern over any possible delays in contract performance.[12]

These provisions authorize the WUTC to grant temporary and expedited Certificates, without a hearing, if necessary, while a permanent application is pending. *See* Wash. Rev.Code § 81.77.110; *see also* Wash. Admin. Code § 480–70–136. Therefore, the

11. Waste Management—Washington also argues that Blue Dot cannot be deemed "responsible," because Waste Management—Washington has an outstanding judgment against Blue Dot. *See* Waste Management—Washington Brief at 17–18. Although the documents submitted by Waste Management—Washington indicate that a summary judgment was issued against Blue Dot, Blue Dot's counsel indicated that Blue Dot's pursuit of that matter is far from over. *See* TR at 55. At any rate, the Administrative Record contains no information concerning whether that judgment is final or whether the time for appeal of the matter has expired. Further, Blue Dot has been deemed financially responsible with respect to other federal contracts under which Blue Dot is currently performing. *See* TR at 55; *see also* September 27, 2004 Blue Dot Supp. Submission.

12. Wash. Rev.Code § 81.77.110 provides, in part:
> The commission may with or without hearing issue temporary certificates to engage in the business of operating a solid waste collection company, but only after it finds that the issuance of such temporary certificate is consistent with the public interest. Such temporary certificate may be issued for a period up to one hundred eighty days where the area or territory covered thereby is not contained in the certificate of any other solid waste collection company. In all other cases such temporary certificate may be issued for a period not to exceed one hundred twenty days.... The commission shall collect a fee of twenty-five dollars for an application for such temporary certificate.

Wash. Rev.Code § 81.77.110.

Further, Wash. Admin. Code § 480–70–136 provides, in part:
> The commission may grant temporary authority using an expedited application process to meet an immediate or urgent need for service if it determines that doing so would be consistent with the public interest.
>
> \* \* \* \* \* \*
>
> (1) Determining public interest.
>
> \* \* \* \* \* \*
>
> (c) The presence or lack of available service capable of meeting the needs; and
> (d) Any other circumstances indicating that a grant of the expedited temporary authority is consistent with the public interest.

Wash. Admin. Code § 480–70–136.

Wash. Admin. Code § 480–70–131 provides, in part:
> (6) Length of service allowed under temporary certificate. The commission may issue a temporary certificate effective for a period:
>
> \* \* \* \* \* \*
>
> (b) Of up to one hundred twenty days when the area or service territory is contained in another company's certificate; or
> (c) That continues until the commission grants, denies, or dismisses a parallel certificate application for permanent authority, or until the temporary certificate is otherwise canceled, whichever happens first. The permanent certificate application must be filed within thirty days of the temporary certificate application or within thirty days of the order granting the temporary certificate.

Wash Admin. Code § 480–70–131.

Air Force would have ample opportunity to support the successful bidder's WUTC Certificate application by expressing the Government's need to comply with the HUBZone Small Business Program and immediate need for the services. Therefore, the Air Force's determination that applying for a WUTC Certificate necessarily would result in delay of contract performance lacks a rational basis, particularly since Waste Management—Washington also has agreed to continue performance until this matter is final.

**b. The Air Force's Determination That Offers Would Not Be Received From Two Or More HUBZone Small Business Concerns Lacked A Rational Basis.**

The Small Business Reauthorization Act of 1997 (P.L. 105–135, Title VI) authorized the Historically Underutilized Business Zone, or "HUBZone," program to provide contracting incentives for small businesses located in areas of economic distress. The relevant statutory provision states:

Notwithstanding any other provision of law—

\* \* \* \* \* \*

(B) a contract opportunity shall be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns if the contracting officer has a reasonable expectation that not less than 2 qualified HUBZone small busi-

ness concerns will submit offers and that the award can be made at a fair market price;

15 U.S.C. § 657a(b)(2)(B).[13]

In this action, the Government has not contested the mandatory nature of the HUBZone Small Business Program nor has it challenged it is an unlawful preference, although, in discussions with the WUTC about whether additional Certificates may be issued, the Air Force improperly referred to the HUBZone program as a "preference." *See* AR at 665. Instead, the Government simply maintains the position that each potential HUBZone offeror would be required to obtain a Certificate from the WUTC in order to be eligible for this contract. *See* Gov't Brief at 25. As discussed above, neither 42 U.S.C. § 6961(a) nor Wash. Rev.Code § 81.77 requires that an offeror possess a WUTC Certificate to be eligible to submit a bid on a solid waste collection contract. Wash. Rev.Code § 81.77 only requires that a WUTC Certificate be obtained by the time performance commences. Nevertheless, the Air Force's Final Justification concluded: "[o]fferors on the previous solicitation are expected to show an interest in this procurement, however, they will not be eligible to compete as prime contractors without a certificate for this geographic area issued by the WUTC." AR at 777. The record in this case does not support that conclusion.

---

13. The relevant FAR provisions state:
(a) A participating agency contracting officer *shall set aside acquisitions* exceeding the simplified acquisition threshold for competition restricted to HUBZone small business concerns when the requirements of paragraph (b) of this section can be satisfied. The contracting officer shall consider HUBZone set-asides before considering HUBZone sole source awards (*see* 19.1306) or small business set asides (*see* subpart 19.5).
(b) To set aside an acquisition for competition restricted to HUBZone small business concerns, the contracting officer must have a reasonable expectation that—
(1) Offers will be received from two or more HUBZone small business concerns; and
(2) Award will be made at a fair market price.
48 C.F.R. § 19.1305(a), (b) (emphasis added).
The Small Business Administration ("SBA") regulations also provide:

When must a contracting officer set aside a requirement for qualified HUBZone SBCs?
\* \* \* \* \* \*
(c) ... the contracting officer *must set aside the requirement for competition restricted to qualified HUBZone SBCs* if the contracting officer:
(1) Has a reasonable expectation, after reviewing SBA's list of qualified HUBZone SBCs that at least two responsible qualified HUBZone SBCs will submit offers; and
(2) Determines that award can be made at fair market price.
13 C.F.R. § 126.607(c) (emphasis added); *see also Contract Mgmt., Inc. v. Rumsfeld*, 291 F.Supp.2d 1166, 1174 (D.Haw.2003) ("The SBA and FAR regulations implement Congress's unambiguously expressed intent by mandating that participating agencies set aside contract opportunities to qualified HUBZone small business concerns when the statutory criteria are met.").

The law is clear that a contracting officer must make reasonable efforts to ascertain if it is likely that at least two small businesses capable of performing the work will submit offers. *See* 15 U.S.C. § 657a(b)(2)(B); *see also MCS Management, Inc. v. United States,* 48 Fed.Cl. 506, 511 (2001) (holding that, although 15 U.S.C. § 657a and relevant FAR provisions do not require a particular method to assess small business availability, a contracting officer must make reasonable efforts to determine whether offers will be received from at least two responsible small businesses at fair market prices) *aff'd,* 25 Fed.Appx. 957 (Fed.Cir. 2001); *see Mortara Instrument, Inc.,* Comp. Gen. B–272461, 96–2 CPD ¶ 212, 1996 WL 695203, at *2 (Oct. 18, 1996) (same); *Rochester Optical Mfg. Co.,* Comp. Gen. B–292247, 2003 CPD ¶ 138, 2003 WL 21884877, at *1 (Aug. 6, 2003) (same). Moreover, a contracting officer must base the decision on factors such as: prior procurement history, "the nature of the contract," "market surveys," and/or advice of the agency's small business specialist. *MCS Management, Inc.,* 48 Fed. Cl. at 511.

### i. Prior Procurement History And Nature Of The Contract.

The contract for solid waste collection and recycling services at Fairchild AFB initially was awarded to Blue Dot as a HUBZone program set aside. *See* AR at 178. When this contract was re-solicited in May 2002, the contracting officer again set aside the acquisition under the HUBZone program. *See* AR at 1. Five companies responded. *See* AR at 178. This prior response establishes that it was reasonable for the contracting officer to assume that two or more HUBZone small business concerns would submit offers for any future solicitations involving solid waste collection and recycling services.

On May 29, 2002, when Solicitation F45613–02–Q–A027 initially was bid as a HUBZone set-aside, the technical evaluation and price comparisons received were as follows:

| | Olgoonik | Blue Dot | SI–NOR | Selrico | International Resource Recovery, Inc. |
|---|---|---|---|---|---|
| Technical Evaluation | Acceptable | Marginal | Acceptable | Marginal | Acceptable |
| Total Price All Years | $[ ] | $[ ] | $[ ] $[ ] as revised by SI–NOR | $[ ] | $[ ] |

AR at 234–36. The contracting officer stated that technical and past performance, when combined, significantly were more important than cost or price. *See* AR at 234. The contracting officer also determined that price and unsatisfactory past performance eliminated International Resource Recovery, Inc. from further consideration. *See* AR at 236. Although Olgoonik initially was awarded the contract, it was terminated after Blue Dot protested that Olgoonik was not a small business concern and therefore was not qualified to receive the contract. *See* AR at 411–12, 476, 479–80, 483–84, 511.

With respect to past performance, Blue Dot provided two references and received satisfactory and very good ratings. *See* AR at 235. On the other hand, Fairchild AFB gave Blue Dot's performance on the incumbent contract a marginal performance rating. *See* AR at 235. The majority of the negative comments, however, concerned Blue Dot's operation of the recycling center. *See* AR at

213–14, 216, 218, 235. Ironically, Blue Dot received only an acceptable evaluation regarding solid waste collection, even though Blue Dot had subcontracted those services to Waste Management—Washington. *See* AR at 235.

SI–NOR provided six references from government agencies and overall received very good or exceptional ratings. The Administrative Record does not indicate which of these ratings concerned operation of a recycling center and which concerned solid waste collection, although SINOR provides both services. *See* AR at 235.

Selrico provided two references: one concerning the operation of a recycling center and the other concerned solid waste collection services. With respect to solid waste collection services, Selrico received a very good rating.

Although SI–NOR had an acceptable technical proposal as compared to Blue Dot's and Selrico's marginal technical proposals, SI–NOR raised their cost after discovering that they had bid too low. *See* AR at 236. SI–NOR's increased cost, from $[ ] to $[ ] for all years of the contract, was $[ ] above the low bidder Blue Dot for the five year contract. *See* AR at 235–36. The contracting officer also noted that Selrico's overall cost of $[ ] would require major negotiations for it to be competitive. *See* AR at 236. With SI–NOR's increase in cost and virtually identical ratings between Selrico and Blue Dot, and taking into account that any resolicitation would fundamentally change technical proposals, past performance evaluation, and costs, the Air Force's determination that offers would not have been received from two or more HUBZone small business concerns lacked a rational basis based on the record.

### ii. Advice Of The Small Business Administration.

After Olgoonik was determined not to be a small business, the Air Force represented that it would "compete the Fairchild waste management contract as a HUBZONE Set-side [sic] for FY 2004 as a result of the encouragement of the SBA. Blue Dot will be specifically included in the solicitation." AR at 668. An e-mail to the Air Force from Mr.

Kevin Michael, Procurement Center Representative of the SBA, advised that the "Air Force should work with the State of Washington to allow other permits to be issued to insure the integrity of the procurement as an [sic] HUBZone set-aside. I would be willing to help in that process." AR at 681. In addition, in its response to Waste Management—Washington's March 24, 2003 protest of the Air Force's resolicitation of the contract as a HUBZone set aside, "SBA urges GAO to find that where the Air Force can satisfy both state & local and federal requirements through reasonable efforts, then it should, where practicable, be required to take those steps. If local and federal requirements cannot be harmonized, then the procuring agency may use this irreconcilable conflict as a justification for utilizing noncompetitive procurement mechanisms, as required by law." AR at 703b. Moreover, in the same response, the SBA objected to the restrictive nature of the Pre–Solicitation notice for HUBZone companies and specifically advised the Air Force:

> It is SBA's opinion that a successful offeror would have a reasonable expectation of getting a second license from the WUTC. If properly informed of the significance of federal requirements and of the strict evaluation requirements for the award of contracts, to include provisions such as responsibility and past performance, it is not unreasonable to believe that a second license could be provided.

> SBA notes that the presolicitation notice requires that a successful offeror must have a permit issued by the WUTC in order to be determined a responsible contractor. SBA urges that a successful offeror be determined first, then required to get a license. By doing so, the Air Force would limit the number of applicants appearing before the WUTC.

AR at 703c.

For this additional reason, the Air Force's determination that offers would not be received from two or more HUBZone small business concerns lacked a rational basis.

4. **The Air Force's Sole–Source Contract No. FA4620–04–D–A003 With Waste Management—Washington Also Appears To Violate Wash. Rev. Code § 81.77.040 And 42 U.S.C. § 6961(a).**

The Subcontracting Plan For Performance Of Fairchild Air Force Base Solicitation F45613–03–Q–A068, attached to and incorporated into the Contract No. FA4620–04–D–A003 with Waste Management—Washington provides that *"[r]ecycling collection services in the Military Family Housing areas* [will be] provided by Olgoonik Logistics a HUBZone small business." AR at 887 (emphasis added). The Subcontracting Plan further provides that "Olgoonik Logistics will continue as our subcontractor *providing residential recycling collection services."* AR at 888 (emphasis added).

The State of Washington defines "solid waste" as "including, but not limited to, garbage, rubbish, ashes, industrial wastes, swill, sewage sludge, demolition and construction wastes, abandoned vehicles or parts thereof." Wash. Rev.Code §§ 70.95.030, 81.77.010. Recyclable materials are not included *except for* source separated materials collected from residences. *See* Wash. Rev.Code § 81.77.010 (emphasis added). Therefore, a recycling company or nonprofit entity may collect and transport recyclable materials from a buy-back center, drop box, or from a commercial or industrial generator of recyclable materials, or upon agreement with a solid waste collection company without a WUTC Certificate. *See* Wash. Rev.Code §§ 81.77.010, 81.77.140. Although Wash. Rev.Code § 81.77.010 and § 81.77.140 do not address recyclables collected from residences, Wash. Rev.Code § 81.77.130 exempts collection of source separated recyclable materials from residences from the Certificate requirement of Wash. Rev.Code § 81.77.040, but that exception applies only to collections "under a contract with any county, city or town" or "any city or town which itself undertakes the collection and transportation of source separated recyclable materials from residences." *See* Wash. Rev.Code § 81.77.130.

Additionally, WUTC regulations provide that "operations of a recycling company or nonprofit entity collecting and transporting recyclable materials from a buy-back center, drop box, or from a commercial or industrial generator of recyclable materials when those recyclable materials are being transported for use other than disposal or incineration, or under agreement with a solid waste collection company (refer to RCW 81.77.140)" are exempt from the Certificate requirements of Wash. Rev.Code § 81.77.040. *See* Wash. Admin. Code § 480–70–011. Therefore, to collect source separated recycling materials from residences, compliance with Wash. Rev. Code § 81.77.040 must be demonstrated.

Under Contract No. FA4620–04–D–A003, Waste Management—Washington is subcontracting the collection of recyclable materials from residences to Olgoonik. *See* AR at 887-88. In reviewing the list of WUTC Certificated Solid Waste Collection Companies (September 1, 2004) Operating Under Chapter 81.77 RCW and Chapter 480–70 WAC, Olgoonik is not listed as having a WUTC Certificate. *See* Waste Management—Washington Brief at Appendix 1; *see also* Wash. Rev.Code § 81.77.040 ("No solid waste collection company shall hereafter operate for the hauling of solid waste for compensation without first having obtained from the commission a certificate declaring that public convenience and necessity require such operation.").

Although WUTC regulations allow a company to enter into an agreement to allow another company to operate in its territory, that provision applies only when the certificated company "lacks suitable equipment to adequately serve its customers, or is unable to provide service on a temporary basis[s]." *See* Wash. Admin. Code § 480–70–151. Further, the WUTC must approve the agreement before any service is provided. *Id.* The Air Force required that Waste Management—Washington provide a WUTC Certificate before commencing operation, however, the record in this case does not evidence that Olgoonik had such a Certificate.

For these reasons, Contract No. FA4620–04–D–A003, which includes the subcontracting plan to Olgoonik, appears to violate 42 U.S.C. § 6961(a) because of Olgoonik's failure to comply with Wash. Rev.Code

§ 81.77.040. By allowing Olgoonik to operate and collect source separated recyclables from residences in Waste Management—Washington's territory, without a WUTC Certificate, Waste Management—Washington's Certificate also is in jeopardy of suspension, thus increasing the likelihood that the WUTC may well be compelled to issue an additional Certificate for the Fairchild AFB area. *See* Wash. Rev.Code § 81.77.090 Penalty (stating that every person who violates or fails to comply with any provision of Wash. Rev. Code § 81.77 or aids or abets in the violation of any provision of Wash. Rev.Code § 81.77 is guilty of a gross misdemeanor); *see also* Wash. Admin. Code § 480–70–161 Suspending Certificates (stating that the Commission may suspend a Certificate for cause, including allowing others to operate under a company's certificated authority without having first obtained Commission approval).

### E. Waste Management—Washington Cannot Claim Immunity From Federal Antitrust Law Under The "State Action" Doctrine In This Case.

### 1. The Legislature Of The State Of Washington Did Not "Clearly Articulate" And "Affirmatively Express" That The Purpose Of Wash. Rev. Code § 81.77.040, As A Matter Of State Policy, Was To Exclude Competition.

In *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the United States Supreme Court held that a statute enacted by a state legislature is immune from federal antitrust scrutiny under the "state action doctrine," based on principles of federalism and state sovereignty. In subsequent decisions, however, a unanimous Court established a two-part test to clarify that state action antitrust immunity is not absolute. Accordingly, the party asserting state action doctrine immunity must demonstrate that the state legislature intended that the statute or regulation at issue supplant competition as a matter of " 'clearly articulated and affirmatively expressed as state policy.' " Second, that the policy must be " 'actively

supervised' " by the state. *See Midcal*, 445 U.S. at 105, 100 S.Ct. 937 (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)).

A private party, like Waste Management—Washington, may claim "state action" immunity but only if both parts of the *Midcal* test are satisfied. *See Federal Trade Commission v. Ticor Title Insurance Co.*, 504 U.S. 621, 636, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992) (holding that these tests "are directed at ensuring that particular anticompetitive mechanisms operate because of a deliberate and intended state policy."). Private conduct cannot be immunized by the state. *See Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 62, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) ("Our holding that there is no inflexible 'compulsion requirement' does not suggest necessarily that petitioners' ... activities are shielded from the federal antitrust laws."); *see also Midcal*, 445 U.S. at 106, 100 S.Ct. 937 ("The national policy in favor of competition cannot be thwarted by casting ... a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement."); *Parker*, 317 U.S. at 351, 63 S.Ct. 307 ("[A] state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful[.]").

The Government argues that the court does not have jurisdiction to review Wash. Rev.Code § 81.77, because it is inapplicable to the Air Force's action in connection with a procurement. *See* Gov't Brief at 14–16. The Government misperceives the court's jurisdiction and relevance of the "state action" doctrine in this case. Since Waste Management—Washington voluntarily submitted to the court's jurisdiction in this case, under 28 U.S.C. § 1491(b)(1) the court has jurisdiction to adjudicate "*any* alleged violation of statute ... in connection with a procurement," including to determine whether Waste Management—Washington utilized its WUTC Certificate in an attempt to monopolize or monopolized solid waste services at Fairchild

AFB.[14] The first step in that analysis is whether such conduct is immune under the "state action" doctrine. *See Freedom Holdings Inc. v. Spitzer,* 357 F.3d 205, 226 (2d Cir.2004) ("[T]he state must substitute its own policy objectives and regulatory oversight for the federal antitrust policy and enforcement mechanisms displaced by the state legislation."). Whether a particular anticompetitive act of an individual furthers state policy, the court would need to know that the state was aware of that party's acts and was supervising them. *See Freedom Holdings, Inc. v. Spitzer,* 363 F.3d 149, 156 (2d Cir.2004) ("[R]equiring clear articulation alone would not suffice to ensure that private acts were approved by the state, because the state could not know in advance how its articulation would be interpreted.").

The first part of the *Midcal* test requires that the state's competitive restraint be "clearly articulated and affirmatively expressed as state policy." *Midcal,* 445 U.S. at 105, 100 S.Ct. 937. Thus, the challenged activity must be "undertaken pursuant to a clearly articulated policy of the State" as a sovereign, "such as a policy approved by a state legislature." *Southern Motor Carriers Rate Conference, Inc.,* 471 U.S. at 63, 105 S.Ct. 1721. The state statute also must specifically show that " 'the legislature contem-

plated the kind of action complained of.' " *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 44, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) (quoting *City of Lafayette,* 435 U.S. at 415, 98 S.Ct. 1123). Although Wash. Rev. Code § 81.77 is an act of the State, there is no "clearly articulated and affirmatively expressed" language that the legislature of the State of Washington intended that the issuance of a WUTC Certificate precluded other companies from competing for solid waste collection services contracts.

When the court invited the views of the Attorney General of Washington as an amicus, that Office stated only that it concurred with the portions of the Government's brief that addressed the "comprehensive statutory and regulatory scheme governing solid waste collection companies operating in Washington." September 13, 2004 Letter from Gregory J. Trautman, Assistant Attorney General of Washington. That Office, however, did not represent that the legislature of the State of Washington intended issuance of a WUTC Certificate to preclude competition, nor could it in light of contrary guidance by the Supreme Court of the State of Washington. *See In re Electric Lightwave, Inc.,* 869 P.2d at 1051 (holding that "the Legislature must expressly grant monopolies ... before the Commission may exercise such rights").

14. It is a matter of public record that the Antitrust Division of the Department of Justice filed four complaints during the period February 15, 1996 to October 14, 2003 in federal district courts alleging that Waste Management—Washington's parent and affiliated corporations in other states have engaged in actions that violated federal antitrust law, including monopolization in violation of the Sherman Act, 15 U.S.C. § 2. In three of these actions, State Attorneys General also were plaintiffs. *See United States v. Waste Management of Georgia, Inc., d/b/a Waste Management of Savannah, and Waste Management of Louisiana, Inc., d/b/a Waste Management of Central Louisiana, and Waste Management, Inc.,* No. CV496-35 (S.D.Ga. Feb. 15, 1996) (complaint alleging monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, in small containerized hauling services in the states of Georgia and Louisiana); *United States, State of New York, Commonwealth of Pennsylvania, and State of Florida v. Waste Management, Inc., Ocho Acquisition Corp., and Eastern Environmental Services, Inc.,* No. 98CV 1768–FB–MDG (E.D.N.Y. Nov. 17, 1998) (complaint alleging that the acquisition of Eastern Environmental Services Inc. will lessen competition substantially

and tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 7, in municipal solid waste in the states of New York, Pennsylvania, and Florida); *United States and State of New Jersey v. Waste Management, Inc., and Allied Waste Industries, Inc.,* No. 1:03CV01409, 2003 WL 23781846 (D.D.C. June 27, 2003) (complaint alleging that the acquisition of Allied Waste Industries, Inc. will lessen competition substantially and tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 7, in small container commercial waste collection service in Pitkin County, Colorado; Garfield County, Colorado; Augusta, Georgia; Myrtle Beach, South Carolina; Morris County, New Jersey; and Bergen and Passaic Counties, New Jersey and municipal solid waste in Bergen and Passaic Counties, New Jersey, and Tulsa and Muskogee, Oklahoma); *United States and State of Florida v. Waste Management, Inc.,* No. 1:03CV02076 (D.D.C. Oct. 14, 2003) (complaint alleging that the acquisition of Allied Waste Management Industries, Inc. will lessen competition substantially and tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 7, in small container commercial hauling in Broward County, Florida).

Nevertheless, Waste Management—Washington argues that "Wash. Rev.Code § 81.77.040 not only allows the WUTC to preclude competition," but "it *requires* it to do so under the circumstances presented here." Waste Management—Washington Brief at 3. Moreover, Waste Management—Washington asserts that the "WUTC *cannot* authorize the operation of another waste collection company if the incumbent solid waste collection company is providing satisfactory service in a territory." *Id.* at 3. To the contrary, Wash. Rev.Code § 81.77.040 provides that whether another Certificate or Certificates will be issued depends on whether the solid waste collection company serving the territory is performing to the satisfaction of the Commission. *See* Wash. Rev.Code § 81.77.040 ("[T]he Commission may, after hearing, issue the certificate only if the existing solid waste collection company or companies serving the territory will not provide service to the satisfaction of the Commission."); *see also* AR at 625–26.

Although the State of Washington has an interest in the public health and welfare of its citizens in providing for the proper collection of solid waste and regulating solid waste collection companies, there is no language in Wash. Rev.Code. § 81.77 that "clearly articulates and affirmatively expresses" that the issuance of a WUTC Certificate was intended to preclude competition by the Legislature of the State of Washington. *See Midcal,* 445 U.S. at 105, 100 S.Ct. 937. Therefore, Waste Management—Washington cannot claim "state action" doctrine immunity in this case.

2. **The Record In This Case Does Not Establish That WUTC "Actively Supervised" Compliance With Wash. Rev.Code § 81.77 With Regard To Sole–Source Solicitation No. F45613–03–Q–A068.**

In *Federal Trade Commission v. Ticor Title Ins. Co.,* 504 U.S. 621, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992), the United States Supreme Court provided detailed guidance as to what is expected from the state to demonstrate the second *Midcal* test, *i.e.,* the active supervision requirement:

[T]he purpose of the active supervision inquiry is not to determine whether the State has met some normative standard, such as efficiency, in its regulatory practices. Its purpose is to determine whether the State has exercised *sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention,* not simply by agreement among private parties. Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy. The question is not how well state regulation works but whether the anticompetitive scheme is the State's own.

*Id.* at 634–35, 112 S.Ct. 2169 (emphasis added). In fact, where a private party is engaging in the anticompetitive activity, a heightened degree of review is warranted, because "there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." *Town of Hallie,* 471 U.S. at 47, 105 S.Ct. 1713. In this manner, active state supervision "serves essentially an evidentiary function: it is one way of ensuring that the [private] actor is engaging in the challenged conduct pursuant to state policy" rather than in pursuit to its own private interests. *Id.* at 46, 105 S.Ct. 1713.

With respect to rate setting, the WUTC requires applicants and certificate holders to submit proposed tariffs prior to their implementation. *See* Wash. Admin. Code § 480–70–331 ("Companies may not implement provisions contained in tariff filings until the Commission approves the filing or until the provisions become effective by operation of law."). The WUTC then posts these proposed tariffs on a public docket and holds a hearing, if necessary. *See* Wash. Admin. Code § 480–07–900 (advising that the Commission holds public meetings and publishes an agenda); *see also* Wash. Admin. Code § 480–70–271 (requiring notices for tariff changes to specify that a customer may comment on the proposed change and attend the public hearing). In addition, the WUTC revises rates, if necessary, after consideration of public comments and filings. *See* Wash. Admin. Code § 480–70–271 (requiring cus-

tomer notices to state that the WUTC has authority to set final rates that may vary from the company's request, depending on the results of the Commission's investigation).

The record in this case does not establish that WUTC actively supervised the prices submitted to the Air Force regarding the Sole–Source Solicitation No. F45613–03–Q–A068. Waste Management—Washington has argued that a HUBZone company performing solid waste services at Fairchild AFB would result in higher rates than those charged by Waste Management—Washington. When the contract was awarded as a HUBZone set-aside, however, the per unit price was $[ ]. The sole-source contract with Waste Management—Washington resulted in higher prices from $[ ] to $[ ] per unit or a [ ]% increase.

| HUBZone Contract 2002 (Option Year 2004–2005) | Unit Price | Sole–Source Contract 2003 (Option Year 2004–2005) | Unit Price |
|---|---|---|---|
| Per unit to Collect solid waste, recyclable materials, and yard waste from Military Family Housing (includes costs of recycling truck and containers, and all labor associated with collection only) | $[ ] | Per unit to Collect solid waste and yard waste from Military Family Housing units. Collect, sort, and deliver recycle material to the base recycle center | $[ ] |

AR at 83, 853. There is no evidence in the record that the WUTC engaged in any supervision regarding this increase of rates.[15]

Since Wash. Rev.Code § 81.77 does not "clearly articulate and affirmatively express" a policy that the issuance of a WUTC Certificate was intended to preclude competition, and the record in this case does not establish that WUTC has "actively supervised" compliance with Wash. Rev.Code § 81.77 by Waste Management—Washington and Olgoonik at Fairchild AFB, the court has determined

that Waste Management—Washington's activities in bidding and providing solid waste services to Fairchild AFB are not immune from antitrust scrutiny under the "state action" doctrine.

By this ruling, the court makes no determination that Waste Management—Washington has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by attempting to monopolize or monopolizing solid waste collection and disposal services at Fairchild AFB, only that Waste Management—Washington may not claim immunity under the "state action" doctrine in the event the court may need to reach that issue in related proceedings or if the Government does not comply with this final judgment. See 28 U.S.C. § 1491(b)(1). In that regard, the court notes that the *modus* operandi employed by Waste Management—Washington in this case apparently has been tried by an affiliated company in another court without success. See, e.g., *Waste Management of North America, Inc. v. Weinberger*, 862 F.2d 1393, 1397–98 (9th Cir.1988) (holding that the court lacked jurisdiction to adjudicate Waste Management of North America's claim that the El Toro Marine Corps Air Base was required to award Waste Management of North America with a waste collection award since it was the only permittee in Orange County, because the case was not properly initiated as a citizen suit under RCRA. In addition, the United States Court of Appeals for the Ninth Circuit held that Waste Management of North America did not have standing under 31 U.S.C. § 3551(2) since it did not file a proper bid protest nor submit a bid.). If Waste Management—Washington and its affiliated companies have been engaging in a pattern of improperly invoking RCRA to preclude government military bases from awarding contracts to small business set asides, further inquiry may be in order. See Timothy J.

---

15. The record also does not establish that the WUTC "actively supervised" compliance with local solid waste management plans. As discussed above, Waste Management—Washington's current Sole–Source Contract incorporates a subcontracting plan that provides that Olgoonik is providing collection of source separated recycling materials from residences at Fairchild AFB.

See AR at 887–88. Under Wash. Rev.Code § 81.77, source separated recycling materials from residences requires a WUTC Certificate. The Administrative Record does not evidence that Olgoonik has such a Certificate and, therefore, appears to have been performing services at Fairchild AFB in violation of Wash. Rev.Code § 81.77.

Muris (former Chairman of the Federal Trade Commission), "Clarifying the State Action and Noerr Exemptions," 27 HARV. J.L. & PUB. POLICY 443 (2004) ("About one-third of our gross domestic product is government.... We know much of this growth in government harms consumers. It reflects rent-seeking, pure and simple.... Antitrust law is not a cure for rent-seeking, but ... it can be much better tailored to address the problem.").

## F. Remedies.

In the context of a bid protest, a permanent injunction may only be issued if the plaintiff demonstrates by a preponderance of the evidence that: it is successful on the merits; it will suffer irreparable harm if injunctive relief is not granted; the harm to the plaintiff, if an injunction is not entered, outweighs the harm to the Government if an injunction is granted; and the injunction is in the public interest. *See, e.g., Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987); *PGBA, LLC v. United States*, 389 F.3d 1219, 1225–26 (Fed.Cir.2004); *Spherix, Inc. v. United States*, 62 Fed.Cl. 497, 505 (2004).

### 1. A Permanent Injunction Regarding Sole–Source Solicitation No. F45613–03–QA068 And Contract No. FA4620–04–D–A003 Is Warranted.

#### a. Success On The Merits.

■ For the reasons previously discussed, the record in this case supports by a preponderance of the evidence that the plaintiff's claim that the Air Force's decision to issue Sole–Source Solicitation No. F45613–03–Q–A068 and award Waste Management—Washington Contract No. FA4620–04–DA003 was contrary to law and lacked a rational basis. *See* 5 U.S.C. § 706(2)(A); *Galen Med. Assocs., Inc.*, 369 F.3d at 1329; *Impresa*, 238 F.3d at 1332–33.

#### b. Irreparable Harm.

In deciding whether to impose the "extraordinary remedy" of an injunction, the court is required to consider whether a plaintiff has an adequate remedy or would suffer irreparable harm. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1227–29 (Fed.Cir. 2004) (stating that court first must consider "whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief."); *FMC Corp.*, 3 F.3d at 431 (determining that irreparable harm is established where there is no "meaningful relief that can be applied retroactively[.]"); *see also Overstreet Elec. Co., Inc. v. United States*, 47 Fed.Cl. 728, 743–44 (2000) (holding that the relevant inquiry when assessing irreparable injury is whether there is an adequate remedy in the absence of an injunction).

The loss of an opportunity to compete for a contract and secure any resulting profit has been recognized as "significant harm" to issue an injunction. *See United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998); *see also Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed.Cir.1983) (holding that evidence of specific competitive injury establishes irreparable injury warranting injunctive relief); *International Res. Recovery, Inc. v. United States*, 60 Fed.Cl. 1, 8 (2004) (determining that a lost opportunity to compete constitutes irreparable harm); *Gentex Corp. v. United States*, 58 Fed.Cl. 634, 654 (2003) (holding that lost opportunity to compete on level playing field is sufficient to establish irreparable harm); *PGBA, LLC v. United States*, 57 Fed.Cl. 655, 664 (2003), *aff'd* 389 F.3d 1219, 2004 WL 2650819 (Fed.Cir.2004) (acknowledging "that lost opportunity to compete may constitute irreparable harm").

In this case, Blue Dot was deprived from competition and being awarded Contract No. FA4620–04–D–A003 because of the Air Force's unlawful decision to issue Sole–Source Solicitation No. F45613–03–Q–A068, circumventing the requirements of 10 U.S.C. § 2304(a)(1)(A) by unlawfully determining that solid waste collection and disposal services were available from only one "responsible source." In light of the size of this procurement, this was no small loss for a small business like Blue Dot. *See Overstreet*, 47 Fed.Cl. at 744 ("[T]he potential loss of valuable business on [a] contract ... has

been found sufficient to prove irreparable harm.").

### c. Balance Of Hardships.

The balance of hardship element requires a consideration of the harm to each of the parties. *See Parcel 49C Limited Partnership v. United States*, 31 F.3d 1147, 1154 (Fed.Cir.1994) (holding that injunctive relief better serves public interest where Government has shown no likelihood of material harm from an injunction that "will remove the taint of illegality from this procurement process without interfering with the Government's discretion to select its own contractors."); *see also Gentex Corp. v. United States*, 58 Fed.Cl. 634, 654 (2003) ("[Courts] must balance the potential harm to the plaintiff of not granting the injunction against the potential harm to both the Government and the awardee should the injunction be granted.").

The Government argues that it will be harmed because collection and disposal of solid waste at Fairchild AFB is a "mission essential service" that would be interrupted unnecessarily while the Government waits to see if the contract awardee receives a Certificate. *See* Gov't Brief at 23–24, 29. The Government also argues that such interruption would subject Fairchild AFB to state and local penalties for violation of state and local solid waste laws. *See* Gov't Brief at 29. Wash. Rev.Code § 81.77.110 and Wash. Admin. Code § 480–70–136, however, provide that expedited and temporary Certificates can be issued without a hearing while a permanent application is pending. These provisions alleviate the Government's concerns regarding any possible service interruption or possible violations of solid waste laws.

Further, in this case, requiring the Air Force to resolicit this contract as a HUBZone small business set-aside will not cause the Government harm, because Waste Management—Washington is currently providing the services on a month-to-month basis until this proceeding is concluded. *See* TR 5. Therefore, in light of the immediate and continuing harm to Blue Dot, as well as other potential small businesses, the balance of harm weighs in favor of Blue Dot.

### d. Effect On The Public Interest.

#### i. The Integrity Of The Procurement Process Was Compromised In This Case.

Our appellate court has emphasized "the importance of ensuring that the public's faith in the integrity of the procurement process is not compromised[.]" *Central Arkansas Maint., Inc. v. United States*, 68 F.3d 1338, 1343 (Fed.Cir.1995) (Mayer, C. J.); *see also Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1151 (Fed.Cir.1994) (holding that, "[w]ithout a valid reason for cancelling the procurement, ... the Government violated its duty to conduct a fair procurement."); *C.A. C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1573 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed.Cir.1983)) (holding that Tucker Act jurisdiction is founded on "an implied contract to have the involved bids fairly and honestly considered."); *Meister Bros., Inc. v. Macy*, 674 F.2d 1174, 1177 (7th Cir.1982) (citing *United States v. Wharton*, 514 F.2d 406, 412–13 (9th Cir.1975)) ("[The] public has an interest in seeing its government deal ... fairly with its citizens."). In determining whether the government has breached its implied contract with the public, thus warranting the court's exercise of injunctive power, the court must consider whether the government has committed a clear and prejudicial violation of a statute or regulation during the procurement process. *See Central Arkansas Maint., Inc.*, 68 F.3d at 1342 (holding that "only violations that amount to a breach of the government's implied contract to consider an offer fairly and honestly will support the court's exercise of its injunctive powers.").

In this case, the court has determined that the Air Force acted contrary to law in issuing a sole-source solicitation and contract to Waste Management—Washington, instead of deferring to the SBA's expertise in deciding whether HUBZone small businesses are "responsible" to perform the required services. In doing so, the procurement process was

compromised, which adversely affected Blue Dot as well as other contractors.

### ii. National Defense And National Security Considerations.

The Tucker Act, specifically, requires the court to take national defense and national security into account before ruling on bid protest actions. *See* 28 U.S.C. § 1491(b)(3); *see also PGBA, LLC,* 389 F.3d 1219, 1225–26 (stating that "[S]ection 1491(b)(3) merely instructs courts to give due regard to the issue of national defense and national security in shaping relief.").

In this case, the Government has argued that "national security" is at stake because of the possibility of "bird strikes," if Fairchild AFB's garbage is not collected. *See* TR at 33–34; *see also* Gov't Brief at 30. There is no reason to believe that national defense or national security will be adversely affected, since Waste Management—Washington will continue to provide solid waste collection and disposal services at Fairchild AFB until a new solicitation is issued and contract is awarded. *See* TR 5.

### 2. Bid And Proposal Expenses And Attorney's Fees And Costs

Blue Dot also has requested payment for bid and proposal expenses, including costs and attorney's fees associated with this protest. *See* Pl. Compl. ¶¶ 5, 6 at 8. The Tucker Act states that the court may award monetary relief in post-award bid protests for "bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2); *see also* 28 U.S.C. § 1920; *E.W. Bliss Co. v. United States,* 77 F.3d 445, 447 (Fed.Cir.1996) (holding that unsuccessful bidder is awarded its bid preparation costs because the government "violated its 'implied contract to have the involved bids fairly and honestly considered' "). Therefore, Blue Dot may file an appropriate motion and supporting documentation to seek recovery of bid preparation and proposal costs. In addition, Blue Dot may move for an award of attorney fees and expenses under the Equal Access to Justice Act, if it meets the threshold requirements of that Act. *See* 28 U.S.C. § 2412(b).

### CONCLUSION

For the afore going reasons, Blue Dot's April 12, 2004 Motion for Injunctive Relief and September 27, 2004 Motion to Supplement the Administrative Record are granted; the Government's September 13, 2004 Motion for Judgment on the Administrative Record is denied; the Intervenor Waste Management—Washington's September 13, 2004 Motion for Judgment on the Administrative Record is denied; but Waste Management—Washington's September 12, 2004 Motion to Amend to correct clerical errors is granted.

The Clerk of the Court is directed to enter a final judgment that orders the Air Force to: 1) set aside Sole–Source Solicitation No. F45613–03–Q–A068 and Contract No. FA4620–04–D–A003; 2) issue a new Solicitation to procure solid waste collection and disposal services required by Fairchild AFB in compliance with the CICA and HUBZone Small Business Program; and 3) award a new Contract on or before July 1, 2005. Waste Management—Washington, however, may continue performance under Sole–Source Contract No. FA4620–04–D–A003 until July 1, 2005.

In addition, Blue Dot may move for bid preparation and proposal costs, pursuant to 28 U.S.C. § 1491(b)(2), and for other costs, pursuant to 28 U.S.C. § 1920. Blue Dot also may move for an award of attorneys fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(b).

**IT IS SO ORDERED.**